**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John William MARX and William Frederick Shriver, Defendants-Appellants.**

Nos. 72–1773, 72–1774.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 10, 1973.

Decided Oct. 3, 1973.

Rehearing Denied in No. 72–1773
Nov. 12, 1973.

James M. Gansinger, Denver, Colo., for defendant-appellant Marx.

David W. Duncan, Durango, Colo., for defendant-appellant Shriver.

Nathan G. Graham, U. S. Atty. (Robert P. Santee, Asst. U. S. Atty., on the brief), Tulsa, Okl., for plaintiff-appellee.

Before PHILLIPS, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

Appellants were charged in a three count indictment with robbing a Tulsa, Oklahoma, bank in violation of 18 U.S.C. § 2113(a), (d) and (e).[1]

Appellants were found guilty by a jury on each of the three counts. For purposes of sentencing both defendants, the trial court merged Counts I and II. On those merged counts Marx was given a sentence of 25 years and fined $10,000, and on Count III he received a 42-year sentence. Shriver was given a like sentence on the merged counts and 40 years on Count III.

Under the evidence, the facts are uncontroverted. While Houston Adams, president of the Farmers & Merchants Bank and Trust Company (Bank), was returning home from an early morning walk on May 2, 1972, he was assaulted by two men. Brandishing a pistol, these men forced their way into the Adams' home and ordered Adams to awaken his

---

1. 18 U.S.C. § 2113(a). Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association, . . .

\* \* \* \* \*

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(d). Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

18 U.S.C. § 2113(e). Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

wife and two teenage children. After gathering the family together, the men boldly stated that they were going to take money from the Bank. To effect this plan, Mrs. Adams was given a cashier's check for $49,500 drawn on the Nevada State Bank and was ordered to forge the payee's signature. The check was then handed to Mr. Adams with instructions to take it to the Bank, negotiate it for cash, and leave the money in a local parking lot.

To insure that Adams would not inform authorities, a bomb was strapped to his left side. As a further incentive for obedience, the rest of the family was tied to a bed and a bomb was placed underneath the bed. Adams was warned that if he failed to follow instructions both bombs would be detonated. Adams and Marx then left the home in different cars, and Shriver remained at the home until both returned to the home.

Adams followed instructions as ordered. Upon entering the bank he endorsed the cashier's check, made it payable to himself, and presented it for payment to Jerry O. Lewis, the bank's vice president and chief cashier. Nothing was mentioned of the circumstances surrounding this unusual request. Lewis handed the check to Miss Barton, chief teller, who in turn gave Lewis $49,500 in cash. After receiving the money, Adams promptly delivered it to Marx at the designated parking lot. Adams was next ordered to go back home for further instructions. Both then returned to the home in separate cars.

It was then decided Adams should return to work and act as if nothing had happened. Mrs. Adams and the children were set free, but to prevent notification of authorities the bomb was left strapped to Adams. His wife was reminded that if she wanted to collect life insurance money all she needed to do was call the police. The children were also warned against calling anyone if they wished to see their daddy again. Marx and Shriver then left the home. Several hours later the ordeal ended when Mrs. Adams received a telephone call informing her the bomb strapped to her husband was deactivated.

Marx and Shriver subsequently were arrested for robbing a federally insured bank. At trial all four members of the Adams family positively identified appellants as their assailants. Some members also testified that during the time appellants held them hostage Marx addressed Shriver by his correct first name. A taxi driver testified that on the day of the robbery he drove Marx to a street address near the Adams home. Government exhibits 12 and 13 were photographs of Marx's fingerprints found on the cashier's check. Exhibit 8 was $3,000 discovered in the trunk of a car rented by Marx. This money was in the same denomination as that taken from Adams. From this and other evidence, appellants were convicted of bank robbery.

■■ Appellants' most novel contention is that no bank robbery occurred and thus they were improperly charged and convicted. They argue that if any crimes were committed they were crimes of extortion, obtaining money by false pretenses, and kidnapping, none of which violates 18 U.S.C. § 2113. They suggest that to violate subsection (a) of that statute there must be a taking from an individual of property "belonging to, or in the care, custody, control, management, or possession of . . ." a bank, it follows that as Adams endorsed the cashier's check, he is ultimately responsible for its payment. Thus, appellants further argue, possession and title to the money are in Adams rather than the Bank. We cannot subscribe to this reasoning and argument.

It is correct to conclude that § 2113(a) is not directed toward the crimes of extortion and obtaining money by false pretenses; still more is involved in this case than the above two crimes. Robbery is committed when a person:

   . . . by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any

other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association. . . . § 2113(a).

Whether the bank was robbed depends upon whether or not Adams turned the money over to appellants in his capacity as an officer of the bank. To reach this determination we must first decide whether appellants intended to rob the Bank or Adams personally. While Adams was being held hostage Marx told him "we are not robbing you, but you represent a bank and we are going to use you and your family to get some of that bank's money." Corroborative of this intent was Marx's demand that Adams cash the check and then bring the check back. Obviously Adams could return the check only in his capacity as a bank officer. Appellants later told Adams' 13-year-old daughter that her father could get something from the bank they wanted—money. Appellants clearly intended to rob the Bank.

The second question is at what point did the Bank lose custody, control or possession of the money. Appellants argue that title and possession transferred when the money was turned over to Adams. We cannot agree, for it is apparent the Bank lost possession at the moment Marx took the money from Adams at the parking lot. Testimony of Lewis showed that the money given Adams belonged to the Bank. Barton testified she did not give Lewis marked bills because she was transferring money to a bank officer. Adams' excuse for cashing the check was because several good bank customers needed the money quickly. Without question Adams was given bank money for banking purposes, and thus not until Marx forcefully took it from him did the Bank lose possession and control. Appellants were therefore properly convicted of bank robbery. *See* United States v. Jakalski, 237 F.2d 503 (7th Cir. 1956), cert. denied, 353 U.S. 939, 77 S.Ct. 817, 1 L.Ed.2d 761; Rumfelt v. United States, 445 F.2d 134 (7th Cir. 1971), cert. denied, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 94.

Marx argues the trial court erred in refusing to instruct the jury on appellant Shriver's theory of defense, that being if a crime were committed it was the crime of extortion or obtaining money by false pretenses rather than the crime of bank robbery. Marx's trial counsel, however, informed the trial court he did not object to the court's proposed instructions and that Marx had no additional instructions to offer. Failure to object at trial to instructions given to a jury precludes objection on appeal; hence this issue has not been preserved for our review. Glazerman v. United States 421 F.2d 547 (10th Cir. 1970), cert. denied, 398 U.S. 928, 90 S. Ct. 1817, 26 L.Ed.2d 90. In addition, this contention has been answered by our prior discussion of the crime actually committed.

Marx next alleges error in admitting into evidence $3,000 in cash taken from his automobile six weeks after the crime. He urges that under two situations only can money be admitted: first, when there is proof of an unlawful taking completed with convincing identification of the property stolen; second, when a defendant impecunious prior to robbery has unexplained possession of large amounts of money after the robbery. The conclusion follows that as there is no proof of Marx's prior poverty nor that the $3,000 in his possession is an unusual amount of money, it is error to admit the money into evidence. We agree with Marx's statement of law, but the money can nevertheless be admitted on grounds of relevancy. For it to be admitted, all that is required is that it have enough rational connection with the issues to be considered a factor contributing to the deciding of the issues. United States v. Pugliese, 153 F. 2d 497 (2d Cir. 1945). Testimony of Lewis indicated the $49,500 consisted of $100 and $20 bills. The money found hidden in Marx's car trunk was all in $100 bills. Admission of this exhibit is

relevant and has probative value to show similarity between money in Marx's possession and that stolen from the Bank. We cannot say the trial court abused its discretion in finding the $3,000 in cash relevant. United States v. Brewer, 427 F.2d 409 (10th Cir. 1970).

Both appellants charge error in the trial court's failure to set bond prior to trial. Their position is that as bank robbery is not a capital case, in light of recent Supreme Court decisions, the trial court committed reversible error in refusing to admit them to bail. We agree failure to set bail is error, but appellants should at that time have taken an appeal to this court if they wished to raise the issue. See Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951). No justification has been given for their failure to appeal the trial court's denial, and thus it is too late to do so after conviction. See United States v. Williams, 416 F.2d 4 (5th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970); Hemphill v. United States, 392 F.2d 45 (8th Cir. 1968), cert. denied, 393 U.S. 877, 89 S. Ct. 176, 21 L.Ed.2d 149; Hewitt v. United States, 110 F.2d 1 (8th Cir. 1940), cert. denied, 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409. There is, furthermore, no showing that appellants' incarceration impeded their preparation for trial or otherwise prejudiced appellants concerning their right to a fair trial.

Appellants next allege error in the trial court's failure to declare a mistrial after two offered but unadmitted government exhibits were mistakenly given to jurors to take to the jury room. Exhibit 9 is a consent-to-search form signed by Shriver concerning the search of his house. Exhibit 10 is a package of $1,000 in $20 bills found in Shriver's house. The money was wrapped in foil and marked exactly as was the $3,000 found in Marx's car. Appellants contend the jury knew the unadmitted money was in the same denomination as that taken from Adams. They also argue that both the $3,000 and $1,000 were wrapped in foil, thus enabling the jury to conclude money found in Shriver's house is related to money found on Marx's premises. Supporting their argument is the trial court's refusal to admit exhibits 9 and 10 on grounds their prejudicial value outweighed any probative value. It is difficult for us to follow the reasoning of the trial judge in admitting the package of bills taken from Marx and rejecting that taken from Shriver. From the record we deem both to have been admissible.

Generally, the law in this area is settled; if there is the slightest possibility that harm could have resulted from the jury's viewing of unadmitted evidence, then reversal is mandatory. Dallago v. United States, 138 U.S.App. D.C. 276, 427 F.2d 546 (1969); United States v. Adams, 385 F.2d 548 (2d Cir. 1967). Under this rule we may also determine whether the unadmitted exhibits 9 and 10 harmed or prejudiced appellants. Four witnesses who observed appellants for approximately five hours positively identified them as assailants. A taxi driver's testimony placed Marx in the vicinity of the Adams' home during the robbery. Marx's fingerprints were found on the bogus cashier's check. We are of the opinion that under all the direct and circumstantial evidence appellants' guilt is overwhelming, therefore the jury's viewing of exhibits 9 and 10 does not constitute prejudicial error. Sawyer v. United States, 112 U.S.App. D.C. 381, 303 F.2d 392 (1962), cert. denied, 371 U.S. 879, 83 S.Ct. 150, 9 L.Ed. 2d 116.

Shriver contends there is inadequate evidence to prove he carried a weapon capable of placing the life of Adams "in jeopardy" as required by 18 U.S.C. § 2113(d). The second count of the indictment alleges:

While committing the offense described in Count I of this indictment, John William Marx and William Frederick Shriver did willfully, unlawfully and with felonious intent, put in jeopardy the life of said Houston Adams by the use of a dangerous weapon, to wit, a pistol, and by the use of a de-

vice which said John William Marx stated was a bomb.

Shriver's position is the "bomb" used to threaten Adams was incapable of inflicting harm; it was inoperable and therefore incapable of placing a life in an objective state of jeopardy as required by the definition of "dangerous weapon." Shriver further asserts only Marx used a pistol and as Shriver was not connected with a pistol, he should not have been convicted under Count II.

We reject Shriver's position for several reasons. First, as there is no evidence the gun held by Marx was not loaded, it was within the province of the jury to infer that it was. Lewis v. United States, 365 F.2d 672 (10th Cir. 1966), cert. denied, 386 U.S. 945, 87 S. Ct. 978, 17 L.Ed.2d 875. Shriver and Marx were charged as principals in the indictment because the acts of Marx in brandishing the pistol were as a matter of law the acts of Shriver. See Caton v. United States, 407 F.2d 367 (8th Cir. 1969), cert. denied, 395 U.S. 984, 89 S. Ct. 2149, 23 L.Ed.2d 773. Second, the fake bomb also constitutes a dangerous weapon because it placed Adams in reasonable expectation of death or serious bodily injury as required by § 2113(d). United States v. Beasley, 438 F.2d 1279 (6th Cir. 1971), cert. denied, 404 U.S. 866, 92 S.Ct. 124, 30 L.Ed.2d 110. We thus find the evidence proved beyond a reasonable doubt that acts of Shriver placed Adams' life in an objective state of jeopardy.

A related argument proffered by Shriver is that the trial court committed reversible error in instructing the jury that "in jeopardy" could mean simply fear of death as opposed to the actual risk of death. The jury was instructed:

> To "put in jeopardy the life" of a person "by the use of a dangerous weapon or device" means, then, to expose such person to a risk of death, *or to the fear of death,* by the use of such dangerous weapon or device. (Emphasis added).

Shriver asserts this charge was error insofar as the jury could have found that "fear of death" rather than an objective state of danger constituted jeopardy. Also, without a finding that lives were objectively in danger there would be no way to distinguish subsection (d) of § 2113 from subsection (a) which prohibits robbery "by force or violence, or by intimidation."

Shriver did not object to the charge as given at trial. Before passing on the issue, under Rule 52(b), F.R.Crim.P., we must determine whether the charge, if erroneous, constitutes plain error. It is our belief the court in United States v. Beasley, *supra,* properly explains what is meant by "jeopardy" requiring an objective state of danger. In *Beasley* the court noted that § 2113(d) requirements are satisfied when the defendant is shown:

> (a) to have created an apparently dangerous situation, (b) intended to intimidate his victim to a greater degree than the mere use of language, (c) which, does in fact, place his victim in reasonable expectation of death or serious bodily injury. (At 1282–1283).

A jury determined that Adams' life was objectively in a state of danger. There were two pistols employed by appellants to further the crime. A pistol was used by appellants to gain entrance into the Adams' home. Shriver carried around a bag containing what appeared to be a pistol with a silencer attached to it. As stated previously, the jury may infer these pistols were loaded. Lewis v. United States, *supra.* Thus when the jury was instructed that jeopardy meant fear of death, it had no evidence before it proving that Adams' life was not in an objective state of danger. Under these circumstances we can say the jury could have found beyond a reasonable doubt that Adams was exposed to the risk of death, and any mention in the charge relating to "fear of death" was harmless error.

Shriver charges he was improperly convicted under Count III of the indict-

ment because there was no "accompanying" as required by § 2113(e). Count III reads:

> While committing the offense described in Count I of the indictment, John William Marx and William Frederick Shriver did force the said Houston Adams to *accompany them* without the consent of the said Houston Adams, and did force Mrs. Houston Adams, Kim Adams, and Kerri Adams to *accompany them* without the consent of the said Mrs. Adams, Kim Adams, and Kerri Adams. (Emphasis added).

Shriver argues that "accompany" connotes a physical juxtaposition among the participants and a sense of movement or travel. He rationalizes that although Adams and his family were somewhat contained in their activities, they were never physically traveling with either appellant.

 Our research and a careful examination of the evidence adduced by the government convinces us Marx and Shriver did not violate § 2113(e) during commission of the bank robbery. Although § 2113(e) adopts the words "or forces any person to accompany him without the consent of such person," the legislative history suggests it was enacted to combat the multitude of murders and kidnappings occurring during attempts by bank robbers to flee the scene of the crime. S.Rep.No.537, 73d Cong. 2d Sess. (1934); H.R.Rep.No.1461, 73d Cong. 2d Sess. (1934). While the statute does not explain the elements of kidnapping and we have been unable to find any cases laying out these elements under § 2113(e), we believe they are similar to those under the common law and the federal kidnapping statute. Under common law "kidnap" meant to take and carry away any person by force and against his will. Under the federal kidnapping statute, 18 U.S.C. § 1201, kidnapping is an unlawful seizure and holding followed by interstate transportation. Gawne v. United States, 409 F.2d 1399 (9th Cir. 1969). Although we do not feel it is necessary under § 2113(e)

to transport the seized person across state lines, we do feel more is required than forcing Adams to enter his own house or forcing the Adams family to move from the den to a bedroom. We therefore must conclude it was error to convict appellants under Count III.

In view of the sentences as pronounced and what we have already said, we need not give consideration to the question of concurrent sentences.

Accordingly, the sentence and conviction under Count III is hereby set aside and vacated. The case, insofar as it pertains to Count III, is remanded with directions to dismiss that count of the indictment. In all other respects the case is affirmed.