**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John Steven REED, Defendant–Appellant.**

No. 93–8305.

United States Court of Appeals,
Fifth Circuit.

July 6, 1994.

M. Carolyn Fuentes and Philip J. Lynch, Asst. Federal Public Defenders, Lucien B. Campbell, Federal Public Defender, San Antonio, TX, for appellant.

Joseph H. Gay, Jr., and Richard L. Durbin, Jr., Asst. U.S. Attys., James H. DeAtley, U.S. Atty., San Antonio, TX, for appellee.

Before GARWOOD and EMILIO M. GARZA, Circuit Judges, and HEAD *, District Judge.

HAYDEN W. HEAD, Jr., District Judge:

John Steven Reed appeals from his conviction and sentencing on a two-count indictment charging him with bank robbery under 18 U.S.C. §§ 2113(a), (d), and (e), and with using and carrying a firearm during a crime of violence. He argues the evidence was insufficient to establish a violation of 18 U.S.C. § 2113(e); the district court erred in denying defendant's motion to suppress the fruits of the warrantless search and seizure of evidence from defendant's car; at sentencing, the district court erred in adjusting defendant's offense severity level upwards based on a finding that the victim suffered from post-traumatic stress disorder; and the district court's finding at sentencing that defendant's testimony at the suppression hearing constituted an obstruction of justice misapplied the law of perjury. We affirm.

### FACTS AND PROCEEDINGS BELOW

At 6:45 a.m. on September 4, 1992, Sherrie Mack, an employee of the Public Employees' Credit Union in Austin, Texas, arrived at work. After she unlocked the first of two locks on the rear door of the credit union, she felt a gun in her back and a hand on her shoulder. When she turned around, she saw a tall man wearing an "old man's mask," black clothing and gloves, and a black "cape-like" garment.

Following the man's directions, she finished unlocking the door of the credit union, walked inside, and turned off the alarm system. She then led him to the vault and opened it. The robber gave her a bag and told her to put the money from the vault in the bag. She did so, also placing a pack of bills containing a tracking device[1] in the bag. When she finished, the robber ordered her to lie face down on the floor and to place her hands behind her back. He then handcuffed her, tied her feet with a cord, and tried to blindfold her with duct tape. He missed her eyes, however, and wrapped the tape around her forehead.

The robber left the credit union in Mack's car. After he left, she managed to free herself and called the police. Several police cars equipped with tracking devices, along with a helicopter, followed the radio signal to the residence of Reed and his wife. Using a hand-held tracking device, the police followed the signal to a Honda parked in the driveway of the house. They saw nothing in the passenger compartment of the car, and the strongest source of the signal was the trunk. Upon checking, the officers learned the car was registered to Mathew Jeanette Reed with an address different from that of the house. Further, the officers checked the utilities for the house, and discovered they were registered under a different name.

Two officers knocked on the front door of the house and announced "Austin Police." Defendant answered the door, and the officers pulled him out onto the porch to insure their own safety, where defendant identified himself as John Reed. Reed was then placed in the custody of one officer, and two other officers entered the house, where they encountered Reed's wife. One officer saw a set of car keys on a table and asked Mrs. Reed if they were the keys to the Honda. She replied they were. Using the keys, the police opened the trunk of the Honda, finding the stolen money, an "old man" mask, black sweatpants, a black windbreaker, gloves, a roll of duct tape, and a loaded handgun. The police did not obtain a warrant before opening the trunk, though both the Reeds were handcuffed and in custody, and the police had the keys to the car.

While police were searching the house and the car, an officer handcuffed Reed, took him to a police car, and read him a *Miranda* warning. He then questioned Reed about the location of Mack's car, but Reed denied knowledge of the car. Another officer approached and stated the money taken from

---

* District Judge of the Southern District of Texas sitting by designation.

1. A transmitter was hidden inside the pack of money. As soon as the pack was removed from its resting place, it began to transmit radio signals. The police have equipment that enables them to use the radio signals to track the location of the money.

the credit union and clothing worn by the robber was found in the trunk of Reed's car. Eventually, Reed agreed to take the police to Mack's car. After driving around Austin, they located the car in an apartment parking lot.

Reed was indicted in a two-count indictment: (1) bank robbery in violation of 18 U.S.C. §§ 2113(a), (d), and (e); and (2) using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). Before trial, he moved to suppress his statements and the evidence seized as a result of the warrantless search of his car. The district court denied the motion, holding the warrantless search was proper because exigent circumstances existed. Additionally, the court found the search came within the "plain view" exception to the warrant requirement. Further, the court held Reed's statements were voluntary. After a jury trial, he was convicted on both counts of the indictment.

The district court sentenced Reed to 160 months' imprisonment on count one and a consecutive 60–month term of imprisonment on count two. At sentencing, the presentence investigation report recommended the court enhance Reed's offense level based on Mack's post-traumatic stress disorder resulting from the robbery. The court found Mack's disorder to be a "severe bodily injury" and enhanced Reed's offense level by four levels pursuant to U.S.S.G. § 2B3.1(b)(3)(B). Further, the court assessed a two-level obstruction of justice adjustment for perjury during Reed's testimony at the suppression hearing pursuant to U.S.S.G. § 3C1.1.

**2.** 18 U.S.C. § 2113(e) provides:

Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

**3.** In *Marx*, the defendants assaulted a bank president who was on his way home from an early

## DISCUSSION

### A. Insufficient Evidence to Support Conviction Under 18 U.S.C. § 2113(e)

Title 18, U.S.C. § 2113(e) makes it an aggravated circumstance of the crime of bank robbery for the robber to force any person to accompany him without the consent of that person.[2] Upon conviction, the minimum sentence is ten years. The scope of the phrase "to accompany him" is at issue here. Section 2113(e) does not expressly set forth how extensive accompaniment must be to prove this aggravated form of bank robbery, nor has this Circuit decided this issue.

Reed argues the evidence that he forced Mack to walk the short distance from the bank's door to the vault is insufficient, as a matter of law, to support his conviction under 18 U.S.C. § 2113(e). He argues Congress enacted § 2113(e) with the intent to punish the distinct crime of kidnapping that often accompanies the crime of bank robbery, rather than forced movement that is incidental to the crime of bank robbery. Accordingly, he argues, the government should be required to prove a more significant asportation than that involved here. The government should have to prove an asportation similar to that required to sustain a conviction under common law kidnapping or under the federal kidnapping statute, 18 U.S.C. § 1201. Because the movement in this case was incidental to the commission of the robbery itself, and did not amount to the separate crime of kidnapping, Reed argues the Court should reverse his conviction under § 2113(e). Reed cites *United States v. Marx*, 485 F.2d 1179 (10th Cir.1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974)[3],

morning walk. At gunpoint, they forced their way into his house, and ordered him to wake his wife and two children. They gathered the family together, tying the wife and children to a bed and placing a bomb under it. The defendants forced the president to go to the bank and obtain money. One defendant remained at the house with the family. The second defendant traveled in a separate car to the bank. Based on those facts, defendants were convicted under § 2113(e). On appeal, the Tenth Circuit did not address the trip to the bank, other than to point out that the president and his family "were never physically travelling with either appellant." *Marx*, 485

and *United States v. Sanchez*, 782 F.Supp. 94 (C.D.Cal.1992) [4], as support for the proposition that § 2113(e) is intended to punish kidnapping, in the sense of the common law crime or the federal kidnapping statute, rather than forced movement that is incidental to the crime of bank robbery.

In response, the government argues the record belies Reed's argument that the asportation was insubstantial and incidental to the commission of the crime. Further, the government argues Reed's argument is contrary to the express language of the statute and interpretive case law. The government argues that case law establishes that the asportation element of § 2113(e) is satisfied when the defendant forces any person to accompany him without the consent of such person while committing an armed bank robbery. Finally, the government attempts to distinguish the facts at hand from those in *Marx* and *Sanchez* by arguing the facts in those cases constituted a much lower degree of violence and danger than the actions of Reed. The government's position is that Reed's threatening of Mack with a gun outside the credit union, and his forcing her to enter with him constituted a significant change in her environment and served to increase the risk of danger to which she was exposed.

The government cites *United States v. Bauer*, 956 F.2d 239 (11th Cir.) *cert. denied*, —— U.S. ——, 113 S.Ct. 469, 121 L.Ed.2d 376 (1992), as support for its argument. In *Bauer*, the defendant chose two women bank employees as hostages to accompany him in his escape from the bank.

He did not, however, execute his plan of escape; he released the women before leaving the bank when he realized the police presence outside the bank was overwhelming. The defendant claimed there was insufficient evidence to convict him under § 2113(e) because the government did not prove that defendant ever left the premises with his hostages. The Eleventh Circuit held the statute does not require "that the hostages traverse a particular number of feet, that the hostages be held against their will for a particular time period, or that the hostages be placed in a certain quantum of danger.... [T]he government need not prove that the defendant took his hostages off the bank premises. In this case, the government's proof was more than sufficient to convict under § 2113(e)." *Id.* at 241–42.

In this case, Reed forced Mack, at gunpoint and against her own will, to unlock the door of the credit union and to accompany him from outside the building to inside the building. Without that forced accompaniment into the building, there would have been a dearth of proof of the accompaniment issue. Even though the defendant forced her to move within the bank to open the safe and to position himself so that he could bind her to make his getaway, he essentially caused no more accompaniment within the bank than that. Within the context of a bank robbery, there will often be movement within the bank by a bank employee—movement orchestrated by the robber. This orchestration will no doubt sometimes occur in concert with the movement of the robber himself.

F.2d at 1186. Accordingly, *Marx* does not support Reed's argument because the victim in this case physically accompanied the defendant.

**4.** In *Sanchez*, the defendant walked into a bank, grabbed a bank employee from behind, and held a large butcher knife to her throat. He demanded money from another bank employee, and twice sent that employee back for more money, all the while holding the knife to the first employee's throat. When he was satisfied with the amount of money, he directed the second employee to place it on a desk near the door. He forced the first employee to walk with him for about fifteen feet, released her, and left with the money. The entire robbery took two to three minutes. He was charged with violating § 2113(e). The district court relied on cases

from other circuits, California state cases defining common law kidnapping, and the Modern Penal Code to hold that § 2113(e) requires a not insubstantial asportation of the victim. The court concluded the "substantiality of the asportation, although there can be no bright line, should be measured by duration, distance and any change in environment tending to increase the danger to which the victim is exposed, other than any danger inherent in the underlying offense." *Sanchez*, 782 F.Supp. at 97 (citations omitted). The court held the asportation was not sufficient to support a conviction under § 2113(e)—though there was significant danger to the teller because of the knife, that danger was present by virtue of the § 2113(d) offense, and not by reason of the movement of only fifteen feet.

To conclude such circumstances are an aggravating accompaniment would likely convert numerous ordinary (if that word can ever be used to describe extraordinary events) bank robberies to aggravated bank robberies with only the faintest of distinctions between accompanied, *i.e.,* aggravated, and non-accompanied, non-aggravated bank robbers. Finding that moving the victim as a hostage into the bank is an accompaniment, just as moving her out of the bank as a hostage would have been an accompaniment, the Court is satisfied the aggravating circumstances to have been proven here. Accordingly, relief is denied on this ground.

### B. Search and Seizure

The district court denied Reed's motion to suppress the evidence seized from the trunk of his car, holding exigent circumstances justified the warrantless search. The court based that holding on the fact that the radio transmitter in the money taken from the credit union was still emitting signals. If there had been another bank robbery in the area, the court found, those signals would have interfered with the signals being emitted from the second robbery. As additional grounds, the court found the "plain view" exception to the warrant requirement was satisfied. On appeal, Reed argues the court erred on both grounds, and the motion to suppress should have been granted.

■■■ Generally a warrantless search is unreasonable, subject to certain exceptions. *Carlton v. Estelle,* 480 F.2d 759, 761 (5th Cir.), *cert. denied,* 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973). One of those exceptions is that a "warrantless search of an automobile with probable cause is justified where circumstances make a warranted search impracticable." *Id.* at 762 (citing *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *see also United States v. Hernandez,* 901 F.2d 1217, 1220 (5th Cir.

1990). The fact that a car is moveable alone is not a sufficiently exigent circumstance to justify a warrantless search. *See Carlton,* 480 F.2d at 762–63. The court must closely examine the facts to determine if a warrantless search is reasonable. *Id.* Finally, the district court's finding that exigent circumstances were present is a finding of fact and, as such, cannot be reversed absent clear error. *United States v. Richard,* 994 F.2d 244, 248 (5th Cir.1993) (citing *United States v. Vasquez,* 953 F.2d 176, 179 (5th Cir.), *cert. denied sub nom., Gomez v. United States,* —— U.S. ——, 112 S.Ct. 2288, 119 L.Ed.2d 212 (1992)).

■■■ Reed does not dispute that the officers had probable cause to search the car; he simply argues the facts in this case do not present exigent circumstances such that the car could be searched without a warrant.[5] He argues that exigent circumstances exist when the situation presents a degree of urgency, and the mere possibility of a future bank robbery does not create that urgency. He supports that assertion by arguing that unless a second bank was robbed, the continuing transmission did not present a problem. The continuing transmission did not prevent the police from learning if a second robbery occurred; the police would be notified of a robbery over the police radio. Consequently, Reed argues, the mere possibility of a second robbery should not create an exigency.

Reed cites *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as support. In *Coolidge,* the police spent over two weeks investigating the murder of a fourteen-year-old girl, suspecting throughout the whole investigation that both Coolidge and his car were involved in the murder. The Supreme Court held the automobile exception did not apply because no exigencies existed—the opportunity to search the car was not fleeting. The police had known for some time of the probable role the

---

**5.** The following factors may, depending on the facts and circumstances of a particular case, present exigent circumstances in the context of a warrantless search of an automobile: (1) the automobile is moving or easily moveable; (2) opportunities for the destruction of the evidence

exist; or (3) the abandonment of the automobile in a public area. *See, e.g., United States v. Gaultney,* 581 F.2d 1137, 1142 (5th Cir.1978), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 259 (1980).

car played in the crime. Though Coolidge was a suspect in the crime, he had remained extremely cooperative throughout the investigation and there was no indication that he intended to flee. Further, Coolidge had already had ample opportunity to destroy any incriminating evidence. On the night of Coolidge's arrest, there was no indication the car was being used for any illegal purpose and it was regularly parked in the driveway of his house. Further, there was no way Coolidge could have gained access to the car once the officers arrived at the house to arrest him because of the way they approached the house. And, when Coolidge was taken away, the police drove Mrs. Coolidge to the home of some relatives and remained with her until midnight—she had access to neither the house nor the car. Finally, the house was guarded through the night by two officers.

The Court held:

The word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile.

*Id.* at 461–62, 91 S.Ct. at 2035–36.

The government responds by arguing this case is much closer to the facts in *Carlton v. Estelle, supra.* In *Carlton,* the victim was raped between 9:30 p.m. and 11:30 p.m., and went to a hospital. She gave officers a description of the man who raped her and told the officers he drove a blue and white car. Her boyfriend, who was present at the interview, told the officers he knew of a person meeting the description and knew the name of that person's employer. He joined the officers when they went to the employer's home. The employer confirmed that he had an employee who fit the description and drove a blue and white Pontiac. He gave the officers Carlton's name and parents' address.

The officers then went to Carlton's parents' house, where his mother told them the street where Carlton lived. The victim's boyfriend knew the exact address, so the officers went on to that address. They arrived at Carlton's home just after daybreak, several hours after the rape occurred, and observed a blue and white Pontiac parked on the street in front of the house. They surrounded the house, and two officers approached the door. Carlton's wife answered the door and told them Carlton was asleep. When Carlton awoke, he emerged dressed only in shorts spotted with blood. The victim had been treated for head lacerations. The officers immediately arrested Carlton. As the officers and Carlton emerged from the house, Carlton's car was being searched.

The Fifth Circuit held sufficient exigent circumstances existed to justify the warrantless search of Carlton's car. At the point of arrest, the officers had missed no genuine opportunity to obtain a valid warrant to search the car, since it would have been impracticable for them to interrupt their search for the rapist to secure a warrant before proceeding to the house. Further:

Quite apart from the risks posed by the possible intervention of thieves, vandals, and other hypothetical outsiders, this record does show that this car, stationed on a Houston street, not on a highway, was relatively close to persons who knew of it, knew of Carlton's trouble, and had an interest in him. The record does not suggest what these persons or any other person would have done if the officials had not exercised dominion over the car immediately upon arrest. But the short of the matter is this: As regards the exigencies created by the potential intervention of third parties, the record reveals a case which is at least as compelling, if not more compelling, than *Carroll* and *Chambers.*

*Id.* at 763.

The facts in this case are much closer to those in *Carlton.* The officers also missed no opportunity to obtain a valid warrant during a lengthy investigation—they did not know where the car was, nor that it contained the money, until they completed their tracking upon arrival at the house. The pursuit be-

gan shortly after the robbery, and continued until the signal was traced. When the officers arrived at Reed's house, the trail was hot. Finally, the officers believed they needed to deactivate the transmitter as soon as possible so it would not hinder other potential investigations.

Reed argues that once the officers arrived at the residence, and completed their tracking, the exigencies disappeared. He argues that though it would have been impracticable to obtain a search warrant before arriving at Reed's house, it would not have been impracticable, in light of the facts at hand, to do so after arriving. Both occupants of the house were arrested, the police had the keys to the car, no other robberies were reported over their radios, and the police easily could have prevented other parties' access to the car by guarding it until a warrant was obtained.

We must affirm the district court's finding of exigent circumstances absent clear error. Though the officers did not know for sure that another robbery would occur, leaving the car for the amount of time necessary to secure a warrant with the possibility of interfering with the ability to track another robbery was risky. Additionally, Reed had a diminished expectation of privacy in his car. *See United States v. Gaultney,* 581 F.2d 1137, 1144 (5th Cir.1978), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 259 (1980) (citing *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). Further, due to the strength of the signal, the officers were reasonable in their belief that the trunk contained at least part of the money stolen from the credit union. The record contains evidence that nearly the entire neighborhood was outside, observing the events as they unfolded at Reed's house. Though both occupants of the house were arrested and the police had a set of keys to the Honda, they could not know whether that was the only set of keys to the car, or if others were implicated in the robbery, and escaping with part of the money. To leave the vehicle or post some undefined guards while securing a warrant with the valuable evidence inside would be risking the loss of that evidence and potential injury to themselves and the neighbors. Finally, the offi-

cers' belief that they needed to stop the transmission was reasonable under the circumstances. *See Gaultney,* 581 F.2d at 1141 (citing *Carroll,* 267 U.S. at 149, 45 S.Ct. at 283).

■ Reed argues the officers did not need to leave the car unattended while obtaining a warrant because they could have seized and secured the car. However, that argument does not help Reed because if a warrantless seizure is permissible, a warrantless search is permissible as well. *Carlton,* 480 F.2d at 762 (citing *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)). The district court's finding of exigent circumstances is not clear error.

### C. Post–Traumatic Stress Disorder as a "Serious Bodily Injury"

■ The presentence investigation report recommended a six-level increase in Reed's offense level on the ground that Mack's post-traumatic stress syndrome, which was a result of the robbery, was a "permanent or life-threatening bodily injury" under U.S.S.G. § 2B3.1(b)(3)(C). The district court declined to find it was a permanent or life-threatening bodily injury, but found that it was a "serious bodily injury" and increased Reed's offense level by four levels under U.S.S.G. § 2B3.1(b)(3)(B). Reed argues that ruling was based on a misapplication of the Guidelines and on an erroneous factual finding.

Dr. George V.C. Parker reported on his examination of the victim the following:

> Reed's assault on Ms. Mack has turned a high-functioning, employed, hard-working, independent woman, who also successfully handled parenting of two children and running a household, into a frightened, dependent, non-functional, psychiatric casualty with a severe psychiatric disorder.

A "serious bodily injury" means an injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty. U.S.S.G. § 1B1.1, App.Note 1(j). As a non-functioning psychiatric casualty with a severe psychiatric disorder, Mack's condition falls fully within the definition of impairment of a function of mental faculty. Her inability to distinguish

threatening from non-threatening situations is obviously an impairment of a mental faculty and, obviously here, a serious one. In this definition of serious bodily injury, there is no requirement that there be a corporal injury. The defendant argues there must be a bodily, *i.e.*, corporal injury. He urges the Court take that limited approach from the definition of bodily injury at Application Note 1(b) to § 1B1.1. There is no requirement that the Court ignore the language of Application Note 1(j) and rely upon Application Note 1(b) to understand the meaning of serious bodily injury. Accordingly, the record establishes that Mack received serious bodily injury and that the district court was correct in its addition of four points to the defendant's offense level. U.S.S.G. § 2B3.1(b)(3)(B).

### D. Reed's Testimony as an Obstruction of Justice

The district court increased Reed's offense level by two levels pursuant to U.S.S.G. § 3C1.1, which provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Reed argues the district court misapplied the law of perjury.

██ Perjury may serve as the basis for enhancing a defendant's sentence under the Guidelines. *United States v. Dunnigan,* ── U.S. ──, ──, 113 S.Ct. 1111, 1115, 122 L.Ed.2d 445 (1993); *see also* U.S.S.G. § 3C1.1, comment., n. 3(b) (Nov.1992) ("The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: ... (b) committing, suborning, or attempting to suborn perjury"). To impose the enhancement on that basis, the court must find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan,* ── U.S. at ──, 113 S.Ct. at 1116. The test for materiality is "'whether the false testimony was *capable* of influencing the tribunal on the issue before it.'" *United States v. Abroms,* 947 F.2d 1241 (5th Cir.1991), *cert.*

*denied,* ── U.S. ──, 112 S.Ct. 2992, 120 L.Ed.2d 869 (1992) (emphasis in original) (quoting *United States v. Salinas,* 923 F.2d 339, 341 (5th Cir.1991) (quoting *United States v. Giarratano,* 622 F.2d 153, 156 (5th Cir.1980))).

██ At the suppression hearing, one of the officers testified that Reed had led him to Mack's car. Reed testified that he did not do so because he did not know the location of the car. Reed does not dispute the falsity of his statements; rather, he argues the statements were not material to the suppression hearing because the only issues at the hearing were as to the legality of the search of Reed's car, the legality of the search of his home, and the voluntariness of Reed's statements. The statements are material because they had a bearing on the determination of the credibility of the witnesses, which is critical to determining matters such as voluntariness. The sentence enhancement based on perjury is proper.

Accordingly, we AFFIRM Reed's conviction and sentence.