**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jermeka Voya HAWKINS, Defendant–Appellant.**

**No. 95–40828 Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

June 28, 1996.

Jim Middleton, Office of the United States Attorney, Tyler, TX, for Plaintiff–Appellee.

Wayne R. Dickey, Federal Public Defender, Tyler, TX, for Defendant–Appellant.

Before GARWOOD, WIENER and PARKER, Circuit Judges.

PER CURIAM:

Defendant–Appellant Jermeka Voya Hawkins, who was convicted on a plea of guilty to carjacking and possession of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2119 and 924(c)(1) and (2), appeals his sentence only. Hawkins complains of sentencing errors by the district court in (1) assessing a six-level upward adjustment to Hawkins' offense level on grounds of permanent or life-threatening injuries to a victim, pursuant to U.S.S.G. § 2B3.1(b)(3)(C); (2) assessing a four-level upward adjustment for abduction, pursuant to U.S.S.G. § 2B3.1(b)(4)(A); and (3) departing upward from the guideline range for extreme conduct under § 5K2.8, multiple firearms under § 5K2.0, multiple victims under § 2A2.1, and inadequacy of criminal history category under § 4A1.3. When we consider the district court's treatment of the applicable guidelines under the facts peculiar to this case, we conclude that the court committed no reversible error in sentencing Hawkins, and therefore affirm his sentence.

I

FACTS AND PROCEEDINGS

In November of 1994, Hawkins and nine others (collectively, the group) made plans to carjack a vehicle. They left an apartment carrying three firearms: Hawkins had a .410 sawed-off shotgun which he concealed in the sleeve of his jacket; co-defendant Barlow had a .22 caliber revolver, which he tucked in his waistband; and co-defendant Willis had a 20 gauge sawed-off shotgun, which he later gave to co-defendant Fagan.

The group first attempted to flag down a vehicle and take it by force, but was unsuccessful. Then, while walking along a street just before 7:00 p.m., the group observed a van parked inside a fenced parking area of a construction business. Two men, Louigi Height and Marvel McFadden (collectively, the victims), were standing near Height's pickup truck in the parking area, between the van and the truck which were parked some 40 to 50 feet apart. The group decided to approach the victims, ask for a cigarette, engage the victims in conversation, then draw the guns and take the van. Three members of the group remained by the gate of the parking area while the remaining group members approached the victims. Hawkins, Fagan, and Barlow drew their previously concealed firearms and ordered the victims to the ground. While the victims were on the ground, Hawkins, Fagan, and Barlow kicked and hit them, all the time demanding their wallets and the keys to the van. The victims surrendered their wallets

and the van keys, even as they continued to be kicked.

When one of the members of the group started the van, Hawkins, Fagan, and Barlow ordered the victims to get up from the ground and move to the van. Height resisted, the shotgun held by Hawkins was discharged, and Height fell to the ground. Meanwhile, Barlow was holding the .22 revolver to McFadden's head. When Hawkins' shotgun was fired, McFadden bolted and ran, whereupon Barlow shot the revolver at him five times, hitting him in the back at least once, and Fagan fired the 20 gauge shotgun at the fleeing McFadden. McFadden was knocked down by the shots from the pistol and shotgun but managed to get up and crawl over a fence. The group then got into the van and drove away.

Hawkins pleaded guilty to carjacking and possession of a firearm during a crime of violence, and was sentenced to consecutive imprisonment terms of 120 and 60 months. This appeal followed.

## II

### ANALYSIS

#### A. Standard of Review

 We have jurisdiction to review a defendant's challenge to a sentence only if it was (1) imposed in violation of law or as a result of a misapplication of the sentencing guidelines; (2) was the result of an upward departure; or (3) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable. *United States v. DiMarco*, 46 F.3d 476, 477 (5th Cir.1995). We review the application of the sentencing guidelines *de novo* and the district court's findings of fact for clear error. *United States v. Wimbish*, 980 F.2d 312 (5th Cir. 1992), *cert. denied*, 508 U.S. 919, 113 S.Ct. 2365, 124 L.Ed.2d 272 (1993).

#### B. The Merits

##### 1. Permanent or Life Threatening Injury

 Hawkins asserts that the district court erred in increasing his offense level by six levels for causing permanent or life threatening injury to McFadden. He con-tends that the most that the facts could support would be a four-level increase for serious injury.

The Presentence Report (PSR) recommended a six-level upward adjustment pursuant to § 2B3.1(b)(3)(C), a specific offense characteristic for robbery, based on the numerous permanent scars on McFadden's back, arm, and leg resulting from wounds caused by pistol bullets and shotgun pellets. Hawkins objected, arguing that the injuries sustained by McFadden were neither permanent nor life threatening, as they neither caused the loss or substantial impairment of the function of a bodily member, organ, or mental faculty, nor produced any obvious disfigurement that was likely to be permanent. At the sentencing hearing, Hawkins repeated this objection and argued in addition that if the court were to accept the government's argument that the gunshot wounds caused permanent disfigurement, the six-level increase would apply in every case in which someone was shot. The district court overruled the objection, finding that there were some 22 shotgun pellets and bullets in McFadden's body and that there was both permanent scarring and bodily movement restrictions.

Section 2B3.1(b)(3)(C) provides for a six-level increase in the base offense level for robbery if any victim sustains permanent or life-threatening bodily injury. This is defined as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." § 1B1.1, comment. (n. 1(h)).

McFadden testified at the sentencing hearing that in the shooting he had incurred over 30 gunshot wounds to his body, and that his body still contains a number of lead fragments. The government introduced several photographs (not contained in the record on appeal) showing the gunshot wounds to McFadden's back and side. McFadden testified that the physical appearance produced by his gunshot wounds caused him to be too embarrassed to take off his shirt. The district court did not clearly err in finding that

McFadden had sustained permanent and obvious disfigurement.

## 2. *Abduction*

■ Hawkins insists that the district court erred in increasing his offense level by four levels for abduction, pursuant to § 2B3.1(b)(4)(A). He argues that, although there may have been an *attempted* abduction, as a matter of law the victims were never actually abducted because they were not forced from one location to another.

The PSR recommended the upward adjustment for abduction based on the victims' statements that, following their beatings at one location in the parking area (near the pickup truck), they were ordered to go to another location in the parking area some 50 to 60 feet away (near the van); and that they were being physically "assisted" at gunpoint by members of the group, who were moving the victims toward the van in an effort to kidnap them. Hawkins objected, contending that an abduction never occurred. The district court overruled the objection, finding that there was an abduction. This finding was based on (1) testimony that the victims were being moved from the truck's location to the van's location; (2) the fact that Height was being pulled by the hair at gunpoint; and (3) the conclusion that, but for the fact that McFadden broke and ran away, the abduction would have been carried out "even more fully than was done."

Section 2B3.1(b)(4)(A) provides for a four-level increase in the base offense level for robbery "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape." " 'Abducted' means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." § 1B1.1, comment. (n. 1(a)).

At the sentencing hearing Height testified that he was forced against his will to walk approximately 40 to 50 feet from the location near his truck, where he and McFadden were standing, to the location of the van, with Hawkins pulling him by the hair and holding a "shotgun in my gut." Height thought that he was going to be killed and did not want to

get in the van. When they reached the van, Hawkins told Height to get in, Height refused, Hawkins shot him pointblank in the stomach with the sawed-off shotgun, and Height fell to the ground. Fortunately for Height, even though the gun "went off," no pellets actually entered Height's body. Height acknowledged on cross-examination that he was never physically placed inside the van or removed from the parking area.

McFadden testified that (1) he and Height were ordered to get into the van, (2) Barlow held the .22 pistol against McFadden's head and pushed him in the direction of the van, (3) after Hawkins shot Height, Barlow pulled the pistol's trigger while it was against McFadden's head, (4) the revolver snapped but failed to fire, and (5) McFadden then started to run. While he was running away, McFadden was shot by at least two different guns; but, when the van was started, his attackers abandoned their chase, got into the van with the rest of the group, and drove away.

Our independent research has produced no cases in this Circuit interpreting the term "abduction" that is helpful in determining whether the discrete facts of this case constitute an abduction for purposes of § 2B3.1(b)(4)(A). Hawkins cites *United States v. Elkins*, 16 F.3d 952, 953 (8th Cir. 1994), in which the Eighth Circuit affirmed the application of the four-level adjustment for abduction. In *Elkins*, the defendant held a bank patron at knife-point, forced the patron out of the bank and into the parking lot, demanded the keys to the patron's vehicle, then released the patron and escaped in the vehicle. The court stated that there was no doubt that the defendant had forced the bank patron to another location by moving the patron from the bank lobby to the parking lot. *Id.*

The government cites as analogous an Eleventh Circuit case involving the aggravating circumstance, not of abduction but forcible accompaniment under 18 U.S.C. § 2113(e), in which that court stated that the statute did not require that the government prove that the defendant crossed a property line to establish that the defendant forced a

person to accompany him without consent. *United States v. Bauer,* 956 F.2d 239, 241 (11th Cir.), *cert. denied,* 506 U.S. 976, 113 S.Ct. 469, 121 L.Ed.2d 376 (1992).

The defendant in *United States v. Reed,* 26 F.3d 523, 526–28 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1116, 130 L.Ed.2d 1080 (1995), approached an employee of a credit union early in the morning as she was unlocking the exterior doors, forced her at gunpoint to enter the building, turn off the alarm system, open the vault, give him a bag of money, and lie down on the floor, after which he bound her and left. The defendant argued that forcing the employee to walk the short distance from the bank's exterior doorway to the vault was insufficient to prove the accompaniment element under § 2113(e). After noting that, in the context of bank robbery, movement of victims inside the bank frequently will be orchestrated by the perpetrator, so that concluding that such behavior produces accompaniment would convert many ordinary bank robberies into aggravated ones, we stated that "moving the victim as a hostage into the bank is an accompaniment, just as moving her out of the bank would have been an accompaniment." True, our opinion in *Reed* can be read to suggest that crossing the threshold of the bank was an important factor. It can also be read, however, as authority to find abduction when the forced movement from one location to another on a property owned by a single property owner can be the kind of "different location" required for an abduction.

The Seventh Circuit, in *United States v. Davis,* 48 F.3d 277, 278–79 (7th Cir.1993), considered a factual situation similar to the one in *Reed:* The defendant approached a credit union employee as she was unlocking the exterior door, put a gun to her side, and told her to get him all the money. Once inside, he "paraded" her about the building to deactivate the alarm, then to her desk to get the keys to the vault, then to the lobby to turn on the lights, then back to the vault, then inside the vault, and then back to the lobby. The defendant also insisted that the employee accompany him on his getaway, but she refused and he fled. The Seventh Circuit, citing *Bauer* and *Reed,* held that

§ 2113(e) applied. The *Davis* court noted that the defendant forced the employee, at gunpoint, "to go from the parking lot into the credit union," and affirmed the application of the upward adjustment in offense level pursuant to § 2B3.1(b)(4)(A), stating that the defendant's "compulsion of [the employee] at gunpoint to accompany him from the credit union parking lot to inside the credit union easily satisfies the Guidelines' requirement of forced accompaniment to another location." *Id.* at 279. The *Davis* court added that there is "nothing in the text of [§ 2113(e) ] that requires that the elements of a federal kidnapping or any other crime be satisfied." *Id.*

Although some might interpret *Reed* and *Davis* as suggesting that alone movement within the respective parking lots might not have met the requirement of forced accompaniment to a different location; however, we are not prepared to say that such a simplistic distinction is warranted. In ordinary parlance, "location" can refer to a point inside or outside a building or parking lot, so that a minuscule movement, such as the crossing of a threshold separating the interior and exterior of a building, would constitute movement to "a different location." The same could be said of movement from the edge of a parking lot, across the property line, to the public street.

On the other hand, in ordinary parlance "location" is frequently used in reference to a single point where a person is standing, or to one among several rooms in the same structure, or to different floors in the same building. More to the point, we would not be prepared to say, for example, that driving one's vehicle from one parking space in the parking lot at a shopping center to another space in the same parking lot— possibly dozens or even hundreds of yards apart—is not a movement to "a different location," simply because no property line or building threshold has been crossed. In other words, while movement from outside to inside or vice versa, or movement across a property line, might be factors giving support to a conclusion of "different locations," the absence of such facts does not bar such a conclusion. We interpret the term "a different location" as used in § 1B1.1, comment (n.

1(a)) to be flexible and thus susceptible of multiple interpretations, which are to be applied case by case to the particular facts under scrutiny, not mechanically based on the presence or absence of doorways, lot lines, thresholds, and the like.

Here, the victims were certainly "forced to accompany an offender." The accompaniment was made in connection with a getaway. The victims were accosted at one "location," near the pickup truck, then were dragged and forced at gunpoint some 40 to 50 feet to another "location," at the van. We are satisfied that it would be unduly legalistic, even punctilious, of us to say that those were not separate "locations" for purposes of the guidelines' definition of "abduction," or that something as coincidental and insignificant as a lot line or doorway could make or break the determination of "different location." The district court did not commit reversible error in concluding, under the instant set of facts, that an abduction occurred.

### 3. *Upward Departure*

Hawkins' guideline range for Count I was 87 to 108 months. A consecutive sentence of 60 months imprisonment was statutorily required for Count II, the firearms charge. The district court departed upward and imposed a sentence of 120 months imprisonment on Count I.

Hawkins posits that the district court's upward departure based on extreme conduct under § 5K2.8 was erroneous, urging that his conduct did not rise to that level. He insists that (1) the district court's upward departure based on inadequate criminal history category is not substantiated by the record; (2) the district court's stated reasons for the extent of departure are ambiguous; and (3) the district court's findings that (a) multiple firearms were used, and (b) the offense created a substantial risk of bodily injury to more than one victim, are not proper grounds for a departure because these factors are taken into consideration in the sentencing guidelines for robbery in § 2B3.1.

■■■ A district court may depart upward from the sentencing guidelines if the court finds the existence of an aggravating circum-stance that was not adequately taken into consideration by the guidelines. 18 U.S.C. § 3553(b); *United States v. Ashburn,* 38 F.3d 803, 807 (5th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1969, 131 L.Ed.2d 858 (1995). If the court departs upward, it must state the specific reason for doing so. *Ashburn,* 38 F.3d at 807. We review the district court's decision to depart upward for abuse of discretion, and shall affirm an upward departure if (1) the district court gives acceptable reasons for departing, and (2) the extent of the departure is reasonable. *Id.* The district court has wide discretion in determining the extent of departure, and although the district court should give reasons for the extent of the departure, it is not absolutely required to do so. *United States v. Moore,* 997 F.2d 30, 36–37 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 647, 126 L.Ed.2d 605 (1993).

### a. *Extreme Conduct—§ 5K2.8*

■■■ One among several factors identified by the PSR as warranting an upward departure is § 5K2.8's extreme conduct, here the fact that Hawkins fired a shotgun at one of the victims at pointblank range after the victim had already been beaten and had surrendered his wallet. In objecting to the PSR, Hawkins contended that he did not fire the gun intentionally, but that it went off as a result of the victim's spinning around and hitting the gun in the process.

As noted, the victims testified at the sentencing hearing that they were kicked and beaten; that after they surrendered their money and keys, they were forced at gunpoint—while being pushed, shoved, and pulled by the hair—to walk with the group members to the van; and that when Height refused to get in the van, Hawkins shot him pointblank in the stomach. Although Hawkins urges that there should not be an upward departure because he had no intention of murdering Height, he neither testified nor put on any evidence regarding his version of the events. Obviously crediting the victims' testimony, the district court stated, "I think the conduct of the Defendant was unusually brutal, cruel and degrading to the victim or victims as reflected by the testimony, testi-

mony that a shotgun was held to Mr. Height pointblank, and was being held by the hair of his head, which would justify an upward departure."

"If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." § 5K2.8, p.s. In *United States v. Jones*, No. 94–50786, 59 F.3d 1242 (5th Cir. Jun. 21, 1995) (unpublished), we affirmed an upward departure for extreme conduct based on the defendant's actions in pistol-whipping the victim and shooting him while he was running away.

Other circuits have found § 5K2.8's extreme conduct applicable in the context of similar carjackings. *See United States v. Clark*, 45 F.3d 1247, 1251–52 (8th Cir.1995) (upheld upward departure based on extreme conduct in carjacking in which defendant robbed victim, demanded more money, held cocked gun to victim's head and told him he was going to die, then told him to get out of the car and drove away); *United States v. Quinones*, 26 F.3d 213, 217–18 (1st Cir.1994) (held upward departure justified for extreme conduct in carjacking in which defendant continually struck and pistol-whipped victim on head and aimed gun at second victim; remanded on other grounds). The district court did not abuse its discretion in basing its upward departure in part on extreme conduct.

b. *Multiple victims and firearms*

██ The PSR identified § 5K2.0 as another basis for upward departure, given that three guns were fired at two victims. These are factors not dealt with by the robbery guideline, which applies to carjacking. Hawkins objected, arguing that multiple victims and firearms were considered by the Sentencing Commission when it formulated § 2B3.1.

The district court justified its upward departure in part on a finding that at least three firearms were discharged. The district court also justified its upward departure in part on a finding that the offense created a substantial risk of death or serious bodily injury to one or more persons, apparently in reliance on the PSR's recommendation suggesting § 2B3.1, comment. (n. 5) as a basis for departure. This comment states that "[i]f the defendant intended to murder the victim, an upward departure may be warranted; *see* § 2A2.1 (Assault With Intent to Commit Murder; Attempted Murder)." Section 2A2.1, comment. (n. 3) states that "[i]f the offense created a substantial risk of death or serious bodily injury to more than one person, an upward departure may be warranted."

In *Jones*, No. 94–50786, at pp. 3–4, we affirmed the district court's upward departure pursuant to § 5K2.0 on the additional basis of multiple victims. Hawkins is incorrect in asserting that the robbery guideline took multiple victims into consideration. Section 5K2.0 itself states that "because the robbery guideline does not deal with injury to more than one victim, departure would be warranted if several persons were injured." Albeit miraculous, Height was not actually shot; the muzzle of the shotgun was touching his abdomen when it discharged, and he thought that he had been shot and was going to die, but no pellets penetrated his body. Under the *Jones* reasoning, Height's justified fear for his life was sufficient to warrant an upward departure for a second victim. *See Jones*, No. 94–50786, at pp. 3–4; *see also United States v. Fuentes–Vazquez*, 52 F.3d 394, 396–97 (1st Cir.1995) (armed carjacking created risk of harm to bystanders warranting upward departure). Further, Height was beaten, and he alleged that an injury to his back resulted. The district court's upward departure in reliance on the presence of multiple victims is based on an acceptable reason.

██ Regarding the allegedly unwarranted use of multiple firearms as a basis for upward departure, Hawkins cites *United States v. LNU*, 16 F.3d 1168, 1170 (11th Cir.1994), in which the court held that the Commission considered the use of multiple weapons in drafting § 2B3.1. Hawkins fails to add, however, that on rehearing the court

held that the fact that the robbery involved four bank robbers, three of whom were armed, took the case "outside the heartland of bank robberies and justif[ied] an upward departure." *United States v. Omar*, 24 F.3d 1356, 1357 (11th Cir.1994).

The government correctly notes that the question whether the Commission considered the use of multiple firearms when drafting § 2B3.1, the robbery guideline, is an issue of first impression in this circuit. We need not decide that issue definitively today, however. For even assuming arguendo that this factor was considered in confecting § 2B3.1, we chose to follow the reasoning of the Eleventh Circuit and hold that this carjacking, involving ten robbers with three firearms, all of which were discharged, was "outside the heartland," thereby warranting an upward departure pursuant to § 5K2.0. Here, the multiple firearms factor is "present to a degree substantially in excess of that which ordinarily is involved in the offense." *Id.* The district court did not err in relying in part on multiple firearms as a reason for upward departure.

c. *Inadequate Criminal History Category*

■ The district court also stated that an upward departure was justified because "the criminal history of this Defendant probably does not reflect his true criminal activity in the past due to him being a juvenile." The PSR did not identify this factor as one warranting upward departure, possibly explaining why Hawkins' written objections did not address the point. Hawkins argues on appeal that the district court's upward departure based on inadequate criminal history category was unsubstantiated by the record, and that the district court's stated reasons for the extent of departure were ambiguous. When the district court announced this as a basis for departure, however, Hawkins did not object. Neither did he object to lack of notice from the court of its intention to use this point in justification of an upward departure. We therefore review this issue for plain error.

■ Under Fed.R.Crim.P. 52(b), we may correct forfeited errors only when the

appellant shows (1) there is an error, (2) it is clear or obvious, and (3) it affects his substantial rights. *United States v. Calverley*, 37 F.3d 160, 162–64 (5th Cir.1994) (en banc) (citing *United States v. Olano*, 507 U.S. 725, 730–37, 113 S.Ct. 1770, 1775–79, 123 L.Ed.2d 508 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). Even when these three factors are present, the decision whether to correct the forfeited error remains within the sound discretion of the appellate court, which will not exercise that discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Olano*, 507 U.S. at 735–36, 113 S.Ct. at 1778–79.

Hawkins was 16 at the time of this offense. He had no prior convictions, so his criminal history category was I. The PSR notes that Hawkins has no juvenile adjudications, but lists numerous instances of criminal conduct that Hawkins committed as a juvenile, beginning at age 10, but which did not result in convictions. Hawkins did not object to the reliability of the information contained in these paragraphs. Thus, it was not error for the district court to rely on it. *See United States v. Mir*, 919 F.2d 940, 943 (5th Cir. 1990) (if defendant does not object or offer rebuttal evidence to refute facts in PSR, district court is free to adopt facts in PSR without further inquiry).

Contrary to Hawkins' contention, the information in the PSR regarding his juvenile criminal conduct substantiates the court's reason for basing its upward departure in part on inadequate criminal history category. Hawkins does not argue that this is an improper basis for departure. The district court's partial reliance on the inadequacy of Hawkins' criminal history is not erroneous.

d. *Extent of Departure*

Finally, Hawkins asserts that the district court gave ambiguous reasons for the extent of its departure. Even though the court should give reasons for the extent of a departure, it generally need not do so. *Moore*, 997 F.2d at 36–37. Here, the court departed upward from a maximum guideline sentence of 108 months to 120 months. When viewed

in light of all of the reasons given by the court for its upward departure, the extent of the court's departure is reasonable and thus free of reversible error.

For the foregoing reasons, the sentence imposed on Hawkins by the district court is, in all respects,

AFFIRMED.