United States Court of Appeals
Fifth Circuit

**F I L E D**

June 22, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 06-10032

————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROBERT L. MOFFITT; MICHAEL ANTHONY DAVIS,

Defendants - Appellants.

————————

Appeal from the United States District Court
For the Northern District of Texas
(4:05-CR-111-3)

————————

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Co-defendants Robert L. Moffitt ("Moffitt") and Michael Anthony Davis ("Davis") appeal

their convictions and sentences for conspiracy to possess and distribute crack cocaine, distribution

of crack cocaine, and aiding and abetting the same, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C),

846 and 18 U.S.C. § 2.  Moffitt also appeals his convictions for maintaining a drug-involved premises

———————————

[*]  Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

in violation of 21 U.S.C. §§ 856(a)(1) and (a)(2). We affirm for the following reasons.

First, we reject Moffitt's claim that the district court erred in denying his motion to suppress evidence obtained as a result of actions which Moffitt asserts violated the Fourth Amendment—namely a confidential informant's ("CI") driving onto Moffitt's driveway and asking to buy drugs from those in the front yard. In order for the CI's actions to have constituted a Fourth Amendment search, he must have physically intruded onto a constitutionally protected area in which Moffitt had a reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347 (1967). While curtilage is entitled to those same Fourth Amendment protections that attach to the home, *Oliver v. United States*, 466 U.S. 170, 180 (1984), here, the CI did not enter curtilage. A four-factor test is used to determine if an area is within the curtilage of the house: (1) the proximity of the area to the home, (2) whether it is within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from outside observation. *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)). "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment Protection." *Dunn*, 480 U.S. at 301.

Applying the four factors, we find that Moffitt's driveway and the yard in front of his house are not areas "so intimately tied to the home" that they are protected curtilage. The first two factors weigh in favor of the area being curtilage, as the driveway was located directly next to the house, and Moffitt had enclosed the yard and house with a chain-link fence. However, the third factor—"the nature of uses to which the area is put"—weighs against this area being curtilage. *See id.* at 301.

Moffitt's driveway and front yard were access areas for visitors to enter and knock on the front door. With an open gate in an urban neighborhood, Moffitt could not have reasonably expected to keep neighbors, door-to-door salespeople, and trick or treaters from driving or walking to his house and approaching his front door.[1] It follows therefrom that if he has a reasonable expectation that various members of society may enter his property, he should find it equally likely that the police, or a police-hired informant, will do so. We also find that Moffitt fails the fourth factor as he did not take "steps . . . to protect the area from outside observation." *Id.* at 301. While his yard is surrounded by a chain-link fence, on which hung four "no trespassing" signs, this chain-link fence was see-through and did not protect the yard from outside observation. When the CI approached the property, the gate leading to Moffitt's driveway was open. Moffitt might have subjectively manifested his expectation of privacy by posting "no trespassing" signs, but with a driveway open to neighbors and solicitors, it is not an expectation that society is prepared to accept as legitimate. *See California v. Greenwood*, 486 U.S. 35, 39 (1988) ("An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable.").[2] Thus, we conclude that Moffitt exposed his driveway and yard to the public

---

[1] The Ninth Circuit has said that a driveway is "only a semi-private area." *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975). While a driveway might naturally be thought of as a portion of the curtilage, it is still the normal route of access for anyone visiting the premises.

[2] Moffitt also argues that he manifested his expectation of privacy by yelling at the CI to get off his property and by telling him, "we don't do that [expletive] here." Even if we assume that Moffitt is correct, that his statements created a reasonable expectation of privacy in his driveway, his statements make no difference to our analysis because the CI immediately complied with Moffitt's request by backing away from the property and by parking his car on the street. At this point, Davis and another co-defendant, Arnold Bailey, informed Moffitt that the CI was "all right." Bailey then proceeded to sell crack cocaine to the CI on the street in front of Moffitt, who no longer protested. Moffitt does not have a reasonable expectation of privacy in the street and did not protect his property from the CI's observation of his property from the street.

sufficiently to defeat his claim to Fourth Amendment protection.

Second, we reject Moffitt's contention that the government committed a *Brady* violation by not disclosing allegedly exculpatory statements that witness Arlene Clark made to authorities before trial—namely, that in the past, she had sold crack cocaine for Moffitt, but that during the time period in question, she sold crack cocaine for Lester Polty. Not only are Clark's statements not exculpatory, but even if they were, Moffitt has not demonstrated "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Rather, Clark testified to these very statements during the trial, and Moffitt had the opportunity to expose the exculpatory nature of her statements or at least to explore them further.

We also find that the evidence and reasonable inferences therefrom were sufficient to support the defendants' convictions. *See Burton v. United States*, 237 F.3d 490, 497-98 (5th Cir. 2000) (conspiracy and distribution); *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir. 1995) (drug house). Because Moffitt and Davis did not preserve their sufficiency of the evidence challenges by renewing their motions for acquittal at the close of all the evidence, we restrict our review of their claims to whether their convictions resulted in "a manifest miscarriage of justice.*" United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir. 1993). "A miscarriage of justice exists if the record is devoid of evidence pointing to guilt or if the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *Id.* (citing *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992)). At trial, the CI and co-defendant Arnold Bailey testified that Davis, in cahoots with several others, sold crack cocaine from Moffitt's residence. A ten-minute video showed a drug sale taking place in Moffitt's yard. There was also testimony that Moffitt's residence was used as a crack house,

that Moffitt himself cut up crack in his house, and that approximately $500 to $600 worth of crack cocaine was sold from his house each day. A witness testified that Moffitt's bills were paid in exchange for allowing his home to be used as a crack house. In sum, the record contains ample evidence pointing to Moffitt's and Davis's guilt.

We also reject Moffitt's claim that the district court erred by not compelling co-defendant Bailey to testify on allegedly exculpatory matters. *See United States v. Lyons*, 703 F.2d 815, 118-19 (5th Cir. 1983). The record shows that the district court did, in fact, find that Bailey had waived his Fifth Amendment privilege and ordered Bailey to answer Moffitt's questions on direct examination, at which point Moffitt elicited favorable testimony.[3] Likewise, Moffitt's contention that the district court abused it's discretion by declining to sever his case from that of Davis is also meritless. Moffitt asserts he received an unfair trial because trying him together with Davis tempered Bailey's testimony—which Moffitt asserts would have been exculpatory as to him yet inculpatory as to Davis. However, in making these generalized assertions regarding Bailey's hypothetical testimony, Moffitt has not shown that failure to sever his trial from that of Davis caused him "compelling prejudice against which the trial court [was] unable to afford protection." *United States v. Mota*, 598 F.2d 995, 1000 (5th Cir. 1979) (internal citation omitted). As indicated above, the record shows that Bailey did testify at length, much of which was favorable to Moffitt, and Moffitt has not in any way shown that severance from Davis would have further affected Bailey's ability or willingness to testify in Moffitt's favor. *See United States v. Nutall*, 180 F.3d 182, 187 (5th Cir. 1999) (requiring showing

[3] To the extent Moffitt might be arguing that he was denied a fair trial because the district court did not sentence Arnold Bailey before trying Moffitt, so that Bailey would no longer have need of his Fifth Amendment privilege when testifying on behalf of Moffitt, we note that "[t]he sequence in which trials would be held is in the discretion of the court." *Byrd v. Wainwright*, 428 F.2d 1017, 1022 (5th Cir. 1970).

of the substance of co-defendant's testimony if severance was granted).

Finally, we do not find the district court's factual findings during sentencing—both as to the quantity of drugs involved and the designation of Davis as "director" of a drug operation—to be clearly erroneous. *United States v. Betancourt*, 422 F.3d 240, 244-46 (5th Cir. 2005). The district court based the quantity of drugs on Arlene Clark's trial testimony that approximately $500 to $600 worth of crack cocaine was sold each day from Moffitt's residence and on the Pre-Sentence Report ("PSR"), which conservatively estimated this amount to total 2.7 kilograms of drugs during the period charged. The district court likewise based Davis's leadership enhancement on the PSR and Arlene Clark's testimony that Davis, in addition to selling crack cocaine, handled the "day-to-day" operations of the drug conspiracy, including collecting money from the dealers and supplying the dealers with drugs. *See* U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(a), cmt. n.4. Because neither Moffitt nor Davis offered any evidence—other than general allegations that Arlene Clark is a liar and her testimony is not credible—to rebut the information contained in the PSR, the district court's reliance on it was not in error. *Betancourt*, 422 F.3d at 248; *see also Johnson v. Collins*, 964 F.2d 1527, 1532 (5th Cir. 1992) (deferring to trial court's determinations of witness credibility).

AFFIRMED.