# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30476

United States Court of Appeals
Fifth Circuit

**FILED**
March 8, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

RICKEY NIKKI BEENE,

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before WIENER, SOUTHWICK, and GRAVES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Rickey Nikki Beene entered a conditional plea of guilty, and the district court entered a judgment of conviction and sentence. Beene's plea was conditioned on the right to appeal the denial of his motion to suppress evidence obtained during a search of his vehicle and the statements he made following his arrest. We VACATE Beene's conviction and sentence and REMAND for further proceedings in accordance with this opinion.

No. 14-30476

FACTS AND PROCEDURAL BACKGROUND

In June 2012, a dispatcher advised Haynesville (Louisiana) police officers that an unnamed caller reported that Rickey Nikki Beene pointed a gun at people on Mill Street, then left the scene driving a gray Honda Accord. Officers knew Beene to have dealt in illegal drugs.

Beene lived at the intersection of a state highway and Greer Street. Officer Danny Mills drove on the state highway to reach Beene's residence. As he approached Beene's residence, he saw a silver Lincoln Continental parked in the yard with a woman sitting in it. Officers later learned the woman was Beene's wife. He turned onto Greer Street and saw Beene in a gray Honda Accord driving toward him. Officer Mills intended to make a stop based on the dispatcher's information, but Beene turned into his driveway off of Greer Street before Officer Mills activated his sirens to stop him.

Beene parked in his driveway about five feet from the street. Officer Mills parked on the street at the end of the driveway to block Beene's vehicle from exiting. Officer Mills and Beene got out of their vehicles. Beene started walking toward Officer Mills. Officer Mills ordered Beene to stop at his vehicle and place his hands on the trunk. Beene kept coming toward Officer Mills. Officer Mills again ordered Beene to stop and place his hands on the trunk. Beene did not comply, so Officer Mills pulled out his Taser, aimed it at Beene, and told him to stop. Beene again did not comply. Officer Mills gave another command to stop, and Beene finally stopped. Beene got on the ground as directed. Officer Mills decided to handcuff Beene based on his resistance. Officer Mills also believed he had probable cause to arrest Beene based on the report that Beene had brandished a firearm and because of what Beene "ha[d] done in the past." Officer Trent Crook, who arrived later, helped Officer Mills

2

No. 14-30476

handcuff Beene and lift him off the ground.  Officer Mills advised Beene of his *Miranda* rights and placed him in the back of Officer Crook's vehicle.

While the officers were trying to handcuff Beene, his wife Shauntae Heard came "running around the corner."  Officer Mills explained that Beene was being placed under arrest and instructed Heard to stay back.  She stopped moving toward the officer, but she continued to yell at him.  Heard told Officer Mills that she owned the Honda that Beene had been driving.  Officer Mills asked Heard whether she knew if there was a gun in the vehicle.  She said she did not know.  Officer Mills asked Heard if she minded if he checked for a gun, and she asked whether he had a warrant.  Officer Mills did not have a warrant.

At this point, a third officer, Rickey Goode, arrived with a drug-sniffing dog.  Officer Mills explained to Officer Goode that Heard had refused consent to check for a gun.  Officer Goode retrieved his dog, and the dog "did a search pattern" around the Honda Accord.  Meanwhile, the record indicates Beene remained in the back seat of Officer Crook's vehicle and Heard stood by the house.  Neither person had any encounter with the police dog.

The dog alerted, and on that basis, the officers believed they had probable cause to suspect that narcotics either were, or had been, inside the vehicle.  Officer Goode opened the passenger-side door, and Officer Mills immediately saw a bag of marijuana at the front of the driver's seat.  They also found crack cocaine, a substantial amount of cash, and a loaded .380 caliber handgun.

The chief of police, Anthony Smith, also was at the scene.  When the contraband was retrieved, Heard, who was standing near the mobile home talking to Chief Smith and Officer Crook, passed out and fell to the ground.  Emergency medical personnel arrived, but Heard revived without their assistance and refused any treatment.  Chief Smith would later testify that

3

after she recovered, he obtained her written consent to search the residence. Allegedly based on that consent, Chief Smith and Detective Adrian Malone searched the house and discovered additional marijuana, crack cocaine, a small amount of methamphetamine, and a digital scale.

Heard was arrested for resisting the officers' orders. She and Beene were taken to the police station in Haynesville. While at the station, Officer Crook read Beene his *Miranda* rights a second time. Detective Malone arrived at the police station to obtain Beene's recorded statement. Detective Malone advised Beene that he intended to question the people in the neighborhood near the Mill Street Apartment Complex, who had said they saw Beene brandishing a firearm earlier that day. Beene explained that he possessed the firearm that day only for self-defense.

Beene was charged in a six-count indictment with (1) being a felon in possession of a firearm and ammunition, (2) possession with intent to distribute crack cocaine, (3) possession with intent to distribute cocaine powder, (4) possession with intent to distribute methamphetamine, (5) possession with intent to distribute marijuana, and (6) possession of a firearm in furtherance of drug trafficking. Beene moved to suppress evidence of (a) the firearm, ammunition, and drugs seized from his automobile, (b) evidence of drugs seized from his residence, and (c) the post-arrest statements he made about his possession of the firearm.

After an evidentiary hearing, the district court denied Beene's motion as to the evidence seized from his vehicle, finding that it was admissible because it was the result of a search incident to a lawful traffic stop. The court also rejected Beene's argument that the search of the automobile was unlawful because of the presence of the drug-sniffing dog in the driveway of his

residence.  Additionally, the court denied Beene's motion to suppress his post-arrest statements.

The district court granted Beene's motion to suppress the evidence of drugs seized from his residence.  The court noted that two versions of the consent form were produced at the hearing: one that contained Detective Malone's signature as a witness to Heard's consent, and another that did not.  Although the court questioned much of Heard's testimony, it also found Chief Smith's testimony that he obtained Heard's consent to search was not credible.  The court concluded that, despite Chief Smith's and Detective Malone's testimony that they were both present for the signing of the consent form, "there exists indisputable evidence that the consent form was falsified."

Beene filed a motion to reconsider the district court's ruling denying his motions to suppress the evidence obtained from the vehicle.  Among Beene's arguments was that the automobile exception to the warrant requirement did not apply, which was the first time this exception had been addressed by either party.  The Government filed a response without referring to the automobile exception.  The district court summarily denied Beene's motion to reconsider.

Beene entered a conditional guilty plea to the felon-in-possession count, reserving his right to appeal the denial of his motion to suppress with respect to the search of his automobile and his post-arrest statements.  The district court sentenced Beene to 96 months of imprisonment.  Beene timely appealed.

## DISCUSSION

When a district court denies a motion to suppress evidence, we review the factual findings for clear error and legal conclusions about the constitutionality of the conduct of law enforcement officers *de novo*. *United States v. Guzman*, 739 F.3d 241, 245 (5th Cir. 2014).  "The clearly erroneous

standard is particularly deferential where . . . denial of a suppression motion is based on live oral testimony . . . because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014) (quotation marks omitted). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed." *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (quotation marks omitted). We review the evidence in the light most favorable to the party that prevailed in the district court. *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008).

The district court held that the search of Beene's vehicle was a lawful search incident to arrest. We disagree. Under that exception, an officer may search an arrestee's vehicle when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (quotation marks omitted). In this case, the crime of arrest was resisting arrest. Beene's vehicle would not contain evidence of that crime. The Government barely defends the basis for the district court's ruling, but instead argues the evidence was admissible simply as a result of a dog's alerting to the presence of contraband, or under the automobile exception.

Beene argues that the district court erred when it denied his motion to suppress, contending that the search of his automobile violated the Fourth Amendment because it was not conducted pursuant to a lawful traffic stop, did not fall within an applicable exception to the Fourth Amendment, and occurred in his driveway, which allegedly was part of the curtilage of his home. He also argues that, because the searches of his automobile and residence were unlawful, his post-arrest statements were "fruit of the poisonous tree."

We will first discuss the use of the dog.

No. 14-30476

## I.     *Use of Drug-Sniffing Dog*

A dog sniff is typically not a search; it may be conducted even when a detention is not drug-related so long as it does not unreasonably prolong the detention. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407–09 (2005). A sniff may nevertheless be an unwarranted search when it involves an intrusion into a constitutionally protected area, such as the home or its curtilage. *See Florida v. Jardines*, 133 S. Ct. 1409, 1417–18 (2013). In determining if an area is part of the curtilage, we consider: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Here, as the district court noted, only the driveway's proximity to the residence weighs in favor of a finding that it was part of the curtilage of the home. The driveway was open and could be observed from Greer Street. Although fences encircled part of the driveway, nothing blocked its access or obstructed its view from the street. Finally, neither Beene nor Heard took steps to protect their privacy, such as posting "no trespassing" signs. In an unpublished opinion, we held that a similar driveway was not part of the curtilage of a defendant's home; we agree with that analysis. *See United States v. Moffitt*, 233 F. App'x 409, 411 (5th Cir. 2007). Likewise, we hold that the driveway here was not part of the curtilage of Beene's home.

Because Beene's driveway was not part of the curtilage of his home or of any other constitutionally protected area, the police were permitted to bring a dog onto his property to sniff his vehicle. "In a long line of cases, the Supreme Court has held that, except for a house's curtilage, the Fourth Amendment does not protect people from official searches characterized as sights seen in the

7

open fields." *Husband v. Bryan*, 946 F.2d 27, 29 (5th Cir. 1991) (quotation marks omitted) (collecting cases). The Court has clarified that "the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage": "An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver v. United States*, 466 U.S. 170, 180 n.11 (1984). Courts have applied the open-fields doctrine to myriad search locations beyond a literal field. *See* 1 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.4(a) (5th ed. 2014) (collecting cases). Under this expansive definition, Beene's driveway qualifies as an open field.

An open field is not a *protected area* because it does not "provide the setting for those intimate activities" protected by the Fourth Amendment, and "as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be." *Oliver*, 466 U.S. at 179. Moreover, the Supreme Court expressly rejected a case-by-case review of open-fields cases as an unworkable accommodation, noting that such an "ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced." *Id.* at 181–82 (citation omitted).

An investigation of an open field, be it visual, olfactory, or otherwise, does not implicate the Fourth Amendment because "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." *Id.* at 181. The open-fields doctrine does not permit law enforcement officers literally to unearth evidence, contained within an open field but hidden beyond plain view. *See, e.g.*, *Husband*, 946 F.2d at 29. Indeed, any "physically invasive inspection" is commonly recognized as uniquely intrusive, even when performed in a public setting.

8

*Bond v. United States*, 529 U.S. 334, 337 (2000).  A dog sniff, though, is not a physically invasive inspection.

We find no basis to hold that the Government must provide justification for the dog's presence under the open-fields doctrine.  The Supreme Court in *Jardines* concluded that a dog sniff became a search due to the physical intrusion onto the defendant's constitutionally protected property.  *See* 133 S. Ct. at 1417–18.  No such intrusion occurred here.  Indeed, as the Supreme Court has noted, "an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment.  The government's physical intrusion on such an area . . . is of no Fourth Amendment significance."  *United States v. Jones*, 132 S. Ct. 945, 953 (2012) (citations omitted).  Because a dog sniff is not a search in a public place, and because the intrusion on an open field has no Fourth Amendment significance, it must be the case that a dog sniff is not a search in an open field.

The use of police dogs can be intimidating.  There is no specter of that here.  Neither Beene nor Heard had any contact with the dog.  Even if use of a police dog presents a greater intrusion than a typical open-fields search, there is no reasonable expectation of privacy in sights or odors existing in an open field, in plain view or smell, which do not require a physically invasive inspection.  Because the dog sniff was permissible, we must next determine whether the dog's alert justified the police officers' search of Beene's vehicle.

## II.    *Automobile Exception to Warrant Requirement*

The Government claims the search of Beene's vehicle fell within the automobile exception to the Fourth Amendment's warrant requirement.  *See generally United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006).  The Government did not present, and thus the district court did not address, this

exception to the warrant requirement. Nonetheless, Beene injected the issue in his motion to reconsider before the district court. He also made arguments concerning the exception in his briefing on appeal. Beene has not argued we should not consider the issue, but only that the automobile exception does not apply on these facts.

Under the automobile exception, police may stop and search a vehicle without obtaining a warrant if they have probable cause to believe it contains contraband. *See United States v. Ross*, 456 U.S. 798, 807–09 (1982). The exception is justified by the mobility of vehicles and occupants' reduced expectations of privacy while traveling on public roads. *See California v. Carney*, 471 U.S. 386, 392–93 (1985). It has been applied to warrantless searches of vehicles parked in driveways or lots other than those used by the defendant for residential purposes. *See, e.g.*, *Pennsylvania v. Labron*, 518 U.S. 938, 939–40 (1996) (applying the exception to the search of a vehicle located on a city street and another located outside of a farmhouse); *Mack v. City of Abilene*, 461 F.3d 547, 550, 552 (5th Cir. 2006) (applying the exception to the search of a vehicle located in a parking lot outside of a restaurant and another located in the defendant's apartment complex parking lot); *United States v. Sinisterra*, 77 F.3d 101, 105 (5th Cir. 1996) (applying the exception to the search of a vehicle found in a parking lot outside of a shopping center).

In contrast, when a vehicle is parked in the defendant's residential driveway, we generally require that there be exigent circumstances justifying a search. *See Guzman*, 739 F.3d at 246 n.8; *United States v. Pruett*, 551 F.2d 1365, 1369–70 (5th Cir. 1977). If exigent circumstances were present in this case, those circumstances, taken together with the probable cause created by the exterior dog sniff of Beene's vehicle, would justify the interior search of his vehicle.

We have upheld a warrantless search of a vehicle parked in front of a defendant's home after the police, investigating a just-reported rape, followed a lead to the defendant's home and discovered the defendant had blood on his clothes. *See Carlton v. Estelle*, 480 F.2d 759, 760 (5th Cir. 1973). We emphasized the impracticability of obtaining a warrant before arriving at the defendant's home: officers were not required to "stay[] all action until warrants could be obtained" since "circumstances gave no assurance that an effective search or seizure could ever be made if it were not made immediately." *Id.* at 763–64. Additionally, we noted that the defendant's wife was present in the house and that his mother, who had told the police where the defendant lived, resided in the neighborhood. *Id.* at 763. On those facts, we underscored the exigencies involved when a vehicle is "relatively close to persons who knew of it, knew of [the defendant's] trouble, and had an interest in" the defendant. *Id.*

In a more recent case, officers investigating a bank robbery followed a tracking signal located inside a stolen pack of money to a vehicle parked in the defendant's driveway. *See United States v. Reed*, 26 F.3d 523, 525 (5th Cir. 1994). We upheld a warrantless search of the vehicle even though the defendant and his wife had been arrested and the police had seized the only known set of keys to the vehicle. *See id.* at 525, 530. "To leave the vehicle or post some undefined guards while securing a warrant with the valuable evidence inside would be risking the loss of that evidence and potential injury to [the officers]." *Id.* at 530. We rejected the defendant's contention that officers could have secured the vehicle while waiting for a search warrant, reasoning that "if a warrantless seizure is permissible, a warrantless search is permissible as well." *Id.*

Whether "exigent circumstances were present is a finding of fact" to be made by the district court. *Id.* at 528. In this case, the district court did not

make factual findings about whether exigent circumstances were present sufficient to justify a warrantless search under the automobile exception. Indeed, the Government argues for the first time on appeal that the automobile exception applies. Accordingly, we vacate the judgment of the district court and remand for further proceedings.

### III.    *Post-Arrest Statements*

"Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search," including confessions made after an unconstitutional search, "must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013). Beene challenges the post-arrest statements he made in response to questions focusing almost exclusively on his possession of the firearm. The officers discovered this weapon as a result of the search of Beene's vehicle. The Government contends the challenged post-arrest statements should not be suppressed because they were "not obtained by exploiting the illegal search [of Beene's house], but based on evidence obtained during the legal search of the Honda."

The admissibility of Beene's post-arrest statements is contingent on the lawfulness of the warrantless search of Beene's vehicle. The only bases resolved by the district court or presented to that court at the suppression hearing by the Government for upholding the warrantless search have now been reversed. Additionally, the fact that Beene's post-arrest statements were made four hours after the search of his vehicle, and after he was given warning of his constitutional rights, is of no consequence. *See Taylor v. Alabama*, 457 U.S. 687, 690–91 (1982) (holding that six hours between an illegal arrest and

a confession, paired with three distinct *Miranda* warnings, did not constitute sufficient attenuating circumstances).  Thus, Beene's post-arrest statements must be suppressed in the absence of some other basis for their admission.

Because we remand for further proceedings, the admissibility of Beene's post-arrest statements may be reconsidered if an alternative basis to justify the search of Beene's vehicle is presented to the district court and accepted.

* * *

The conviction and sentence are VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

No. 14-30476

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

While I agree that the district court did not find exigent circumstances, I write separately to note my concerns as to the use of the drug detection dog. Although the majority states that a dog sniff is typically not a search, precedent certainly does not support the conclusion that a dog sniff is never a search. In my view, permitting the indiscriminate use of a drug detection dog in this context seriously undermines the fundamental right to privacy and security that the Fourth Amendment serves to protect. Consequently, I respectfully dissent as to majority's holding that the dog sniff in question is not a search.

## I.

To fully consider the authority the government is afforded in this context, it is helpful to review some of the basic principles that govern the scope of the Fourth Amendment's protections. Under the Fourth Amendment, a "'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In determining whether a course of official conduct constitutes a search, we analyze whether an "individual manifested a subjective expectation of privacy in the object" of the investigation and "whether the government's intrusion infringe[d] upon the personal and societal values protected by the Fourth Amendment." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quotations marks omitted). This inquiry requires consideration of both the reasonableness of the expectation of privacy and "the degree of intrusiveness of the [government's] challenged action." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 476-77 (5th Cir. 1982); *see Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 616 (1989) ("Obtaining and examining . . . evidence may

14

. . . be a search if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable." (internal citations omitted)).

Undoubtedly, the officers' use of a drug detection dog on Beene's property "[t]o look over . . . [his vehicle] for the purpose of finding something" qualified as a "search" as that word is used in the everyday sense. *Kyllo v. United States*, 533 U.S. 27, 33 n.1 (2001) (quoting N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (6th ed. 1989)). Whether this investigation constitutes a "Fourth Amendment 'search,'" however, is "not so simple under our precedent." *Id.* at 31. Legitimate expectations of privacy are premised upon "concepts of real or personal property law . . . [and] understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978); *accord United States v. Jones*, 132 S. Ct. 945, 951 (2012). An individual, for example, may possess an expectation of privacy based on a belief that his or her information "will not be broadcast to the world." *Katz v. United States*, 389 U.S. 347, 352 (1967).

Nevertheless, while the privacy the Fourth Amendment protects clearly safeguards against the disclosure of personal information, *id.* at 351-52, its central concern is with the "security of persons against . . . invasive acts by . . . the Government." *City of Ontario v. Quon*, 560 U.S. 746, 755-56 (2010); *see also Soldal v. Cook Cnty.*, 506 U.S. 56, 69 (1992) ("What matters is the intrusion on the people's security from governmental interference."); *see also Alderman v. United States*, 394 U.S. 165, 176-80 (1969) (holding that the property interest an individual possesses in his home provides protection against electronic surveillance of conversations emanating from within whether or not the individual is party to those conversations). When properly conceived, the amendment's protections extend beyond the mere preservation of sensitive information.

No. 14-30476

The Fourth Amendment preserves an individual right to both "privacy *and* security," two interests that speak to different, though related, protections against "arbitrary invasions by governmental officials*." Berger v. New York*, 388 U.S. 41, 53 (1967) (emphasis added) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967); *accord New Jersey v. T.L.O.,* 469 U.S. 325, 335 (1985). These interests are reflected in the amendment's history and its text, which protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures," and was drafted by the framers in reaction to the British Crown's arbitrary intrusions upon their property. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (discussing the framers' desire to create "a right of personal security against arbitrary intrusions by official power"). As the Supreme Court explained more than a century ago, the evils to which the Fourth Amendment was enacted to respond were not limited to "the breaking of [one's] doors [or] the rummaging of [one's] drawers." *Boyd v. United States*, 6 S.Ct. 524, 532, 116 U.S. 616, 630 (1886), *abrogated on other grounds as explained in Fischer v. United States*, 425 U.S. 391, 405 (1976). Rather, "the essence of the offense . . . is the invasion of [an individual's] indefeasible right of personal security, personal liberty and private property." *Id.* The Fourth Amendment's use of the word "secure," then, reflected the framers' "dismay with British search and seizure practices, related to the arbitrary exercise of power to invade their property; security for them, was the ability to prevent such invasions." T. CLANCY, THE FOURTH AMENDMENT: ITS HISTORY AND INTERPRETATION 49 (2008).[1]

---

[1] Our jurisprudence may need to begin placing a renewed emphasis on the security interests that the Fourth Amendment protects. As a result of technological advancements, we now live in an information age in which our everyday tasks often result in our sharing of vast amounts of personal data. A focus on the individual security interests implicated by the

Whether an official investigation has invaded a reasonable expectation of privacy depends on the degree of intrusion caused by the government's actions. *See Florida v. Riley*, 488 U.S. 445, 451-52, 454-55 (1989); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987); *Horton*, 690 F.2d at 476-77; *see also Terry v. Ohio*, 392 U.S. 1, 24 (1968) (considering the "nature and quality of the intrusion on individual rights" in assessing the permissibility of a search for weapons without probable cause). For example, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his or her] right to exclude." *Rakas*, 439 U.S. at 143 n.12; *see United States v. Gomez*, 276 F.3d 694, 698 (5th Cir. 2001) (holding that a defendant had a reasonable expectation of privacy in a third party's vehicle parked on the defendant's driveway based on his "possessory interest in the land"). As a result, investigations that take place upon private property are more intrusive—and more likely to implicate the Fourth Amendment—than those that take place in a public space. *Compare Coolidge*, 403 U.S. at 474-75 ("[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show it falls within one of a carefully defined set of exceptions . . . .") *with Florida v. White*, 526 U.S. 559, 566 (1999) ("[B]ecause the police seized respondent's vehicle from a public area . . . the warrantless seizure . . . did not involve any invasion of respondent's privacy.").

Relatedly, "[p]hysically invasive inspection[s] [are] . . . more intrusive than purely visual inspection[s]," and are generally considered a search. *Bond v. United States*, 529 U.S. 334, 337 (2000); *see also Cupp v. Murphy*, 412 U.S.

---

government's efforts to obtain such information may provide a more appropriate context in which to analyze the seemingly diminishing scope of the Fourth Amendment's protections in this area.

291, 295 (1973) ("Unlike . . . fingerprinting . . ., [a] voice exemplar . . ., or [a] handwriting exemplar" taking scrapings from under a suspect's fingernails constitutes a "severe, though brief, intrusion" and is therefore a search).  The more intrusive the method of investigation, the more likely the technique will constitute a search under the Fourth Amendment.  *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 196-97 (5th Cir. 2009) (holding that officers' entry into a nightclub was a search where the officers "project[ed] official authority by entering with weapons drawn in a S.W.A.T. team raid," and exceeded the scope of the club's public invitation); *compare Maryland v. Macon*, 472 U.S. 463, 469 (1985) (holding that an "officer's action in entering a bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy") *with Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) (holding that officers' inspection of items located behind an enclosed display case constituted a search because it was more intrusive than that of an ordinary customer); *compare also Ciraolo*, 476 U.S. at 213 (aerial observation of backyard held not a search where the police were "within public navigable airspace [and observed the space] in a physically nonintrusive manner"), *with Cuevas-Sanchez*, 821 F.2d at 251 (continuous video surveillance of a backyard held a search because the "intrusion [was] not minimal" and "society is willing to recognize" an expectation to be free from this type of surveillance).  "[W]hat is really involved in Fourth Amendment analysis is our 'societal understanding' about what deserves 'protection from government invasion.'"  *United States v. Smith*, 978 F.2d 171, 177 (5th Cir. 1992) (citing *Oliver v. United States*, 466 U.S. 170, 178, (1984)).

## II.

It is with reference to these principles that the scope and meaning of the two categories of cases most directly implicated by this appeal—the open fields and drug detection dog line of cases—must be evaluated.  An open field is not open season and a drug detection dog is not free from the application of the Fourth Amendment.

## A.

The government first argues that its investigation into the contents of Beene's vehicle did not implicate the Fourth Amendment because the vehicle was parked outside of the curtilage of his home.  This argument oversimplifies the analysis.  The Fourth Amendment "protects people, not places," *Katz* 389 U.S. at 351, and it is implicated even when the government's intrusion occurs at a "location not within the catalog (persons, houses, papers, and effects)" specified in its text.  *See Kyllo*, 533 U.S. at 32 (explaining that the Fourth Amendment applies to the government's "eavesdropping . . . [of conversation in] a telephone booth" even though it is not a person, house, paper, or effect).  Merely labeling a location an open field or "[t]erming . . . [an] area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis." *United States v. Wells*, 648 F.3d 671, 675 n.4 (8th Cir. 2011) (quoting *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980)).

A careful reading of the Supreme Court's open fields precedents demonstrates the scope of the doctrine and its limits.  The concept of the open field can be traced to the Supreme Court's decision in *Hester v. United States*, 265 U.S. 57 (1924).  The defendant in *Hester* was convicted of illegally distilling whiskey based on the testimony of two federal revenue agents who entered onto his land without a warrant.  *Id.* at 58.  Hester was carrying a jug and a bottle out in the open when he and his accomplice noticed the agents.  *Id.* at

58. At that point, Hester and his accomplice dropped the containers they were carrying and attempted to escape. *Id.* The agents testified that the jugs and other containers that were dropped contained illegally distilled whiskey. *Id.*

In rejecting Hester's challenge to the officers' testimony, the Supreme Court held that his "own acts . . . disclosed the jug, the jar, and the bottle . . . [and there was therefore] no seizure . . . when the officers examined the contents of each after it had been abandoned." *Id.* Further, the fact that the officers had trespassed onto Hester's land did not invalidate their actions. *Id.* According to the Court, "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' [did] not extend[] to the open fields." *Id.* at 59.

*Hester*'s textually formalistic approach was characteristic of the Supreme Court's Fourth Amendment jurisprudence until its landmark decision in *Katz v. United States,* 389 U.S. 347 (1967). In *Katz*, however, the Supreme Court rejected the notion that "constitutionally protected area[s]," delineated by the textual categories specified in the Amendment, could "serve as a talismanic solution to every Fourth Amendment problem." *Katz*, 389 U.S. at 351 n.9. "[T]he Fourth Amendment protects people, not places" when individuals whose "expectations of freedom from intrusion are recognized as reasonable." *Id.* at 361 (Harlan, J., concurring).

After *Katz*, the Supreme Court revisited the open fields doctrine in *Oliver v. United States*, 466 U.S. 170 (1984), "to determin[e] whether the government's intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search . . . ." 466 U.S. at 178. *Oliver* brought up two cases for review in which the police, acting on information that did not give to rise to probable cause, trespassed onto

private property and discovered marijuana plants being cultivated in outside areas that were open and accessible to the public. *Id.* at 173-74.

While reaffirming the validity of the open fields concept, the Supreme Court reinterpreted the doctrine in light of its post-*Katz* jurisprudence. First, with respect to the expectation of privacy, the Court observed that "open fields do not provide a setting for those intimate activities that the Amendment is intended to shelter." *Id.* at 179. Rather, activities "such as the cultivation of crops," occur out in the open and can be viewed from outside through a fence or from the airspace above. *Id.* at 179. Second, with respect to the nature of the government's intrusion, the Court explained that a mere technical trespass onto an open field, without more, was not so offensive as to "infringe[] upon the personal and societal values protected by the Fourth Amendment." *Id.* at 182-83. "[A]s a practical matter these lands usually are accessible to the public and the police . . . [and] in most instances the police will disturb no one when they enter upon open fields." *Id.* at 179.

*Oliver*'s reframing of the open field's doctrine, then, was grounded in the same inquiries the Supreme Court has considered since *Katz* in determining whether police conduct constitutes a Fourth Amendment search: the nature of the privacy interest intruded upon and the degree of intrusion caused by the investigative technique. Rather than providing an unlimited exception to all investigations conducted outside of the curtilage of a home "the rule . . . [the Court] reaffirm[ed] . . . provid[ed] that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 466 U.S. at 178.

In adhering to the language of the opinion, this court has observed that while *"Oliver* revitalized *Hester's* open fields doctrine, . . . it explicitly adhered to *Katz* in doing so." *Husband v. Bryan*, 946 F.2d 27, 29 (5th Cir. 1991) (citing

*Oliver*, 466 U.S. at 177-81).　Thus, while the open fields doctrine provides that "the Fourth Amendment does not protect people from official searches characterized as 'sights seen in the open fields,' . . . [n]either this court nor the Supreme Court have extended the open fields doctrine to anything beyond observation searches."　*Id.* (quoting *Air Pollution Variance Bd. of Colo. V.W. Alfalfa Corp.*, 416 U.S. 861, 865 (1974)).　Indeed, "courts that have upheld surveillance conducted on, over, or from open fields have been careful to note the limited extent of the surveillance and to caution against unrestricted surveillance." *United States v. Lace,* 669 F.2d 46, 55 (2d Cir. 1982); *see also Kee v. City of Rowlett*, 247 F.3d 206, 217 n.21 (5th Cir. 2001) ("[T]he open fields doctrine has not been expanded beyond observational searches."); *Allinder v. Ohio*, 808 F.2d 1180, 1185 (6th Cir. 1987) ("In decisions following *Katz*, the Supreme Court has consistently adhered to the open field doctrine while at the same time recognizing that it is limited to sights seen in the open field." (internal quotation marks omitted)); *United States v. Bellina*, 665 F.2d 1335, 1343 n.7 (4th Cir. 1981) (when analyzing "observations made on [a] defendant's property . . . [e]ach intrusion must be examined on its own peculiar facts and each must be analyzed in relation to whether the person challenging the intrusion had a legitimate expectation of privacy in the area or thing observed."); *United States v. Jackson*, 588 F.2d 1046, 1053 n.12 (5th Cir. 1979) ("[T]his court may . . . find a Fourth Amendment violation even though the government agents make their observations from an 'open field.'").　Indeed, the Supreme Court recently reaffirmed this limitation in *Florida v. Jardines*, explaining that while an officer may "gather information in . . . open fields" with greater leeway than in those areas specifically enumerated in the Fourth Amendment's text, the investigation remains "subject to *Katz*."　*Jardines*, 133 S. Ct. at 1414.

Admittedly, an individual's expectation of privacy in a so-called "open field" is limited.  But to say that an expectation of privacy is limited is not to say it does not exist at all.  *See Smith*, 978 F.2d at 180 ("An individual may open the curtains of his home to the view of unenhanced vision without consenting to the view of a telescope." (quotations omitted)). As we have stated on more than one occasion, "[n]o matter where an individual is, whether in his home, a motel room, or a public park, he is entitled to a 'reasonable' expectation of privacy." *Kee*, 247 F.3d at 213 (quoting *Jackson*, 588 F.2d at 1052).  Our evaluation of the government's investigation in this case must be cognizant of these precedential limitations.

**B.**

The scope of the Supreme Court's holdings with respect to the use of drug detection dogs is similarly limited.  The government argues that the use of a drug detection dog to determine the contents of a vehicle does not constitute a search for purposes of the Fourth Amendment under any circumstance.  Again, the analysis is not so straightforward.

"It is . . . important to recognize that [the Supreme Court has not] validat[ed] the use of drug detection dogs in all circumstances."  3 W. LAFAVE, SEARCH AND SEIZURE § 2.2(g) (5th ed. 2012); *see also United States v. Whitehead*, 849 F.2d 849, 857 (4th Cir. 1988) ("*Place* obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts."), *abrogated on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991).  Rather, the Court has validated the suspicionless use of drug detection dogs to investigate inanimate objects located in public places, *see United States v. Place*, 462 U.S. 696, 707 (1983), and vehicles stopped on public thoroughfares, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005).  When utilized in the context of a private dwelling, however, the Supreme Court determined that "[t]he

23

government's use of a trained police dog to investigate the home . . . is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 133 S. Ct. at 1417-18.

The Supreme Court first considered the use of a drug detection dog in *United States v. Place*, 462 U.S. 696 (1983). *Place* involved the use of a drug detection dog to sniff luggage that officers seized in a public airport. *Id.* at 706-07. In analyzing whether the conduct of the police was a search, the Court analyzed both the nature of the information that was exposed by the sniff and the degree of intrusion that was produced by the dog. *Id.* at 707.

The sniff "disclose[d] only the presence or absence of narcotics" and therefore exposed only limited information into the private contents of the luggage. *Id.* at 707. The use of the dog, in turn, did "not require opening the luggage" or "rummaging through [its] contents" and therefore was "much less intrusive than a typical search." *Id.* Based on these two considerations, the Court concluded that the procedure was limited, "both in the manner in which the information [was] obtained and in the content of the information revealed." *Id.* Consequently, the "particular course of investigation the agents . . . pursue[d] [in the case]–exposure of respondent's luggage, which was located in a public place, to a trained canine–did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.*

The Supreme Court reaffirmed this holding in *Illinois v. Caballes*, which extended *Place* to permit "a well-trained narcotics-detection dog . . . [to sniff] the exterior of [a] car while [it is] lawfully seized for a traffic violation." 543 U.S. at 409. Neither case, however, held that the use of a drug detection dog is never a search. Nor has any precedential decision of this circuit extended those holdings to the use of a drug detection dog at a private residence. Indeed, we have long placed limitations on the use of drug detection dogs, for example,

when utilized to investigate an individual's body. *See, e.g., United States v. Kelly*, 302 F.3d 291, 294 (5th Cir. 2002); *Horton*, 690 F.2d at 477-79. Our reasoning in those cases did not hinge upon the glib supposition that a dog sniff is never a search; instead, we engaged in a careful consideration of "the degree of personal intrusiveness" infringed upon by the investigative activity at issue. *Horton*, 690 F.2d at 479.

This reasoning was vindicated in *Florida v. Jardines*—the only case in which the Supreme Court has considered the use of a drug detection dog on private property—where the Court concluded that the use of a drug detection dog to investigate the contents of a home was a Fourth Amendment search. 133 S. Ct. at 1417-18. After *Jardines*, as a panel of this court recently recognized, the contention that "a sniff is not a search" no matter what the circumstance simply cannot "withstand scrutiny." *United States v. Nagy*, 524 F. App'x 958, 959 (5th Cir. 2013) (per curiam) (unpublished). Accordingly, as with any analysis of investigatory conduct under the Fourth Amendment, the question of whether the use of a drug detection dog constitutes a search can only be answered by considering both the nature of the privacy interest at stake and the intrusion caused by the government's investigative activity.

### III.

As the foregoing analysis illustrates, whether the Fourth Amendment limited the officers' ability to utilize a drug detection dog on Beene's private driveway to determine the contents of his vehicle remains an open question. As an initial matter, although the driveway was not within the curtilage of his home, Beene possessed a reasonable expectation of privacy by virtue of his "possessory interest in the land" and his "right to exclude others" by virtue of that interest. *Gomez*, 276 F.3d at 698; *see also Rakas*, 439 U.S. at 143; *Husband*, 946 F.2d at 29. Beene also possessed an expectation of privacy in

the contents of his vehicle, *Arizona v. Gant*, 556 U.S. 332, 344-45 (2009); one qualitatively different than that which he would have possessed had the vehicle been situated on a public thoroughfare, *see Coolidge*, 403 U.S. at 460-62; *Gomez*, 276 F.3d at 697-98.

Although Beene's expectation of privacy did not reasonably extend to any "activities conducted out of doors," *Oliver*, 466 U.S. at 178, the contents of his vehicle were not exposed and the officers were unable to determine what was inside by viewing it from the driveway.  *See* ROA. 368-69. Consequently, to ascertain the vehicle's contents, the officers were required to physically encroach further upon Beene's property with the drug detection dog in order to conduct a more intrusive investigation than a simple "observation search." *Husband*, 946 F.2d at 29.  The question is whether this additional, more intrusive investigation constitutes a search under the Fourth Amendment.  I conclude that it does.

While the officers' presence on Beene's property was permissible and their "[v]isual surveillance was . . . lawful," *see Kyllo*, 533 U.S. at 31, their use of a drug detection dog constituted an additional physical invasion "more intrusive than [a] purely visual inspection." *Bond*, 529 U.S. at 337.  This additional physical investigation exceeded the more limited "observation searches," the Supreme Court has permitted under the open fields doctrine. *See Husband*, 946 F.2d at 29.  The roving "eye cannot . . . be guilty of trespass," *Boyd*, 116 U.S. at 628 (quoting *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765)), but the Supreme Court has repeatedly found physical invasions that exceed the permissible scope of the government's presence constitute a Fourth Amendment search.  *See, e.g.*, *Bond*, 529 U.S. at 338-39 (holding that an officers' physical manipulation of a bus passenger's bag constituted a search because the exploratory manner in which the bag was felt exceeded the usual

handling that would be expected); *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (holding that moving stereo equipment in plain view a "few inches" to record the equipment's serial numbers constituted a search); *New York v. Class*, 475 U.S. 106, 114-15 (1986) (holding that reaching into a vehicle's interior constitutes a search); *Lo-Ji Sales*, 442 U.S. at 329 (holding that officers' viewing of a retail establishment's wares in more physically invasive manner than a customer would view them constituted a search).

Moreover, the very presence of the drug detection dog fundamentally altered the nature of the investigative interaction. *Compare Kentucky v. King*, 131 S. Ct. 1849, 1863 (2011) (police officers may, consistent with the Fourth Amendment, bang on the front door of a residence as loud as they can with the hope of being able to view incriminating evidence), *with Jardines*, 133 S. Ct. at 1416 (police officers may not, consistent with the Fourth Amendment, "introduce[] a trained police dog to explore the area around the home in the hopes of discovering incriminating evidence"). A canine's sniff does not exist in the abstract; it is attached to a large and intimidating animal, which, by virtue of its presence, threatens the sense of security individuals possess in their premises. *Oliver* was premised on the assumption that the "police will disturb no one when they enter an open field." 466 U.S. at 179 n.10. Such reasoning simply does not apply to the use of an animal, which serves as a "highly trained tool[] of law enforcement," *Jardines*, 133 S. Ct. at 1418.

The Supreme Court's analysis in *Florida v. Jardines* supports this conclusion. In *Jardines*, the Supreme Court observed that the prospect of "a visitor . . . marching his bloodhound into the garden before saying hello," would be so disruptive to one's sense of security that it would "inspire most of us to . . . call the police." *Id.* at 1416. While it is true that this observation was made in a case where the drug detection dog was employed within the curtilage of

27

No. 14-30476

the home, the Supreme Court's recognition of the intrusion felt by the dog's presence is not so easily confined to this area.

Drug detection dogs represent a significant "project[ion of] official authority," *Club Retro*, 568 F.3d at 196, which escalates the intrusive nature of the government's investigative presence, *see Horton*, 690 F.2d at 477-78. Any individual who has encountered a drug detection dog in an airport, bus depot, or public sidewalk has experienced the unease that accompanies being confronted with the presence of this intimidating law enforcement tool.[2] Indeed, history is replete with examples of officials using trained dogs, sometimes in aid of state sanctioned violence, to intimidate or control American citizens.[3]    In the modern law enforcement context, police officers

---

[2] Police dogs are often intentionally employed by law enforcement because of their intimidating presence. *See, e.g.,* Jannay Towne, *K9 Fine-Tunes Crime Sniffing Skills*, WHOTV, (April 28, 2015, 6:39 PM), http://whotv.com/2015/04/28/k9-fine-tunes-crime-sniffing-skill. (Des Moines, Iowa K9 police officer explaining that, "As an intimidation factor, [his police dog is] second to none."); Iredia Ohenhen, Alija Mehmedovic, Amel Advic, Hunan Richards, *The K-9 Unit, An Important Part Of Law Enforcement*, CTNOW (Jan. 17, 2012, 8:00 AM), http://www.ctnow.com/about/studentnews/ctn-the-k9-unit-an-important-part-of-law-enforcement-20120117-story.html. (police dogs are "used to intimidate criminals from trying to escape from the police"); Matt Lait, *Role Over for Veteran Police Dog*, L.A. TIMES, Jan. 5, 1991, http://articles.latimes.com/1991-01-05/local/me-6943_1_la-habra. (police officer explaining that "dogs are used more frequently for mere presence and intimidation" than for other uses) (internal quotation marks omitted)).

[3] As one commentator observed:

Dogs were used to attack Native Americans and to chase down runaway slaves. During the Civil War, dogs were used to intimidate and injure African-American soldiers fighting for the North. Following Pearl Harbor, dogs were used to intimidate Japanese Americans residing in Hawaii. In more modern times, police dogs have been used for crowd control, even on nonviolent civil rights demonstrators.

Leslie A. Lunney, *Has the Fourth Amendment Gone to the Dogs?: Unreasonable Expansion of the Canine Sniff Doctrine to Include Sniffs of the Home*, 88 OR. L. REV. 829, 882 (2009).

utilize dogs for a multitude of purposes, other than drug detection, including tracking, apprehending, and immobilizing suspects. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140, 143 (1st Cir. 2003) (discussing the use of the "bite and hold" technique that apprehension dogs utilize in which the dog "will bite and maintain his hold upon a suspect until the handler orders him to let go" and may result in a "struggling suspect being bitten several times if the dog loses his grip and is forced to re-establish his hold").[4]  This history and current practice necessarily shape our "societal understanding" about "the measure of the government's intrusion," *Cuevas-Sanchez*, 821 F.2d at 251, and supports the common sense conclusion that the use of a drug detection dog in this context constitutes a search.  *See Smith*, 978 F.2d at 177 ("[A]ny consideration . . . about the privacy expectations" in a particular context includes an examination of the role the activity "play[s] in today's society."); *see also Terry*, 392 U.S. at 17 n.14 ("[T]he degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security . . . .").

## IV.

The majority holds that "[a] dog sniff is typically not a search; it may be conducted even when a detention is not drug-related so long as it does not unreasonably prolong the detention."  I disagree with the majority's generalization.

Despite what the majority says about exigent circumstances, a decision by the district court to deny the motion to suppress would be erroneous because

---

[4] It is common for police dogs to be cross-trained for both drug detection and suspect apprehension.  Lunney, *supra* note 3, at 835 n.20 (citing Deborah Palman, U.S. Police Canine Ass'n, *K9 Options for Law Enforcement*, http://www.uspcak9.com/2015/06/22/k9-options-for-law-enforcement/ (last visited Nov. 9, 2015)).

it would be tied, at least in part, to a finding that the use of the drug detection dog was lawful.[5] Here, the vehicle at issue was parked in a private driveway. The police responded to a report that Beene brandished a weapon and he was arrested for the crime of resisting arrest. The dog used by the police was not a weapon detection dog or a "resisting arrest" dog—it was a drug detection dog.[6] The drug detection dog could not possibly have been searching for evidence of the crime that Beene reportedly committed. *See generally Arizona v. Gant*, 556 U.S. 332, 353 (2009) (Scalia, J. concurring) ("I would hold that a vehicle search incident to arrest is *ipso facto* 'reasonable" only when the object of the search is evidence of the crime for which the arrest was made, or of another crime that the officer has probable cause to believe occurred."); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (noting the particularity requirement and that "general warrants . . . are prohibited by the Fourth Amendment"). Before using the dog, the police recognized that they had no basis to search the vehicle and asked for permission. The use of the drug detection dog constituted an illegal search.

"The decision to characterize an action as a search is in essence a conclusion about whether the fourth amendment applies at all." *Horton*, 690 F.2d at 476. The holding in this case that the government's use of a drug detection dog is not a search provides the government with unfettered authority to do as it pleases in this context without any reasonable constraints. *See id.* Arguably, based on the logic of this holding, the government may

---

[5] The majority states that "[i]f exigent circumstances were present in this case, these taken together with the probable cause created by the exterior dog sniff of Beene's vehicle, would justify the interior search of his vehicle."

[6] The majority states that "[i]n this case, the crime of arrest was resisting arrest. Beene's vehicle would not contain evidence of that crime."

indiscriminately sweep residential driveways and yards, and potentially the common areas of multi-dwelling residences, unrestrained by any need to justify their actions on the basis of facts or particularized suspicion. A free society should not be subject to such an expansive intrusion upon the basic rights of privacy and security individuals enjoy under the constitution. The Fourth Amendment's fundamental protection is "that in certain places and at certain times [an individual] has the right to be let alone." *Winston v. Lee*, 470 U.S. 753, 758 (1985) (internal quotations omitted). Under these facts, that right should not be compromised.